

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-4-1997

# Caterpillar Inc v. Intl Union United

Precedential or Non-Precedential:

Docket 96-7012

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Caterpillar Inc v. Intl Union United" (1997). *1997 Decisions.* Paper 54.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/54

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 96-7012

———————

CATERPILLAR INC., a Delaware Corporation
doing business in Pennsylvania

v.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; and
its affiliated LOCAL UNION 786,

Appellants

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Civil Action No. 92-01854)

———————

Argued August 8, 1996

Before: NYGAARD, LEWIS and McKEE, <u>Circuit Judges</u>.

Reargued December 2, 1996

Before: SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN,
GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO,
ROTH, LEWIS and McKEE, <u>Circuit Judges</u>.

(Opinion filed March 4, 1997)

———————

DAVID M. SILBERMAN, ESQUIRE
(Argued)
Bredhoff & Kaiser
1000 Connecticut
Avenue,                    N.W.
Suite 1300
Washington, DC 20036


DANIEL W. SHERRICK, ESQUIRE
International Union of
United Auto Workers
8000 East Jefferson
Detroit, MI 48214

WENDY L. KAHN, ESQUIRE
  Zwerdling, Paul, Leibig,
    Kahn,
Thompson & Driesen
  1025 Connecticut Avenue,
      Suite 712
N.W.
        Washington, DC 20036

Attorneys for Appellants


GERALD C. PETERSON, ESQUIRE
  COLUMBUS R. GANGEMI, Jr.,
    ESQUIRE
(Argued)
  Winston & Strawm
    35 West Wacker Drive
      Suite 4200
        Chicago, IL 60601

Attorneys for Appellee

JAMES B. COPPESS, ESQUIRE
815 16th Street, N.W.
Washington, DC    20006

Attorney for Amicus-Appelant,
American Federation of Labor
  & Congress of Industrial
    Organizations (AFL-CIO)


ALLEN H. FELDMAN, ESQUIRE
  EDWARD D. SIEGER, ESQUIRE
    United States Dep't of
Labor
        200 Constitution
Avenue, N.W.          Washington, DC
20210

Attorneys for Amicus Curiae
  United States of America


COUNCIL ON LABOR LAW EQUALITY
  Proposed Amicus-Appellee

---------

OPINION OF THE COURT

---------

2

NYGAARD, Circuit Judge.

In this appeal, we must decide whether an employer granting paid leaves of absence to employees who then become the union's full-time grievance chairmen violates § 302 of the Labor Management Relations Act, 29 U.S.C. § 186. The district court held that this practice is illegal, relying on our decision in Trailways Lines, Inc. v. Trailways, Inc. Joint Council, Amalgamated Transit Union, 785 F.2d 101 (3d Cir. 1986). We will reverse, and in doing so, overrule significant portions of Trailways.

I.

The facts are stated comprehensively in the district court's opinion, Caterpillar, Inc. v. International Union, United Automobile Workers, 909 F. Supp. 254 (M.D. Pa. 1995). For our purposes it suffices to recount that the United Auto Workers, its Local 786 and Caterpillar have been parties to a collective bargaining agreement since 1954. Until 1973, the agreement contained a "no-docking" provision allowing employees who were also union stewards and committeemen to devote part of their work days to processing employee grievances without losing pay, benefits or full-time status. In 1973, this agreement was expanded to allow the union's full-time union committeemen and grievance chairmen to devote their entire work week to union business without losing pay. These employees are placed on leave

3

of absence and are paid at the same rate as when they last worked on the factory floor.  They conduct that business from the union hall, perform no duties directly for Caterpillar, and are not under the control of Caterpillar except for time-reporting purposes.

In 1991, a nationwide labor dispute erupted between Caterpillar and the union, which resulted in the employees returning to work without a contract.  A year later, Caterpillar unilaterally informed the union that it would cease paying the grievance chairmen and questioned the legality of such payments, notwithstanding that it had paid them without complaint for eighteen years.  The union filed an unfair labor practice charge with the National Labor Relations Board, alleging that, by unilaterally rescinding the payments, Caterpillar refused to bargain in good faith.  A month later, Caterpillar filed this suit seeking a declaratory judgment that those payments violate § 302 of the LMRA.

The district court stayed its proceedings pending the decision of the NLRB.  An administrative law judge later issued a recommended decision and order dismissing the union's charges, finding that the payments violated § 8 of the National Labor Relations Act.[1]  The district court then lifted the stay and

---

1.  The ALJ, while questioning the validity of the payments under § 302 of the LMRA, did not reach that issue in his proposed holding.

held that Caterpillar's payments to the union's full-time grievance chairmen violated § 302.  The union now appeals.

## II.

### A.

Section 302(a) of the LMRA provides:
It shall be unlawful for any employer . . . to pay, lend, deliver, or agree to pay, lend, or deliver, any money or other thing of value--

(1) to any representative of any of his employees who are employed in an industry affecting commerce;  or

(2) to any labor organization, or any officer or employee thereof, which represents . . . any of the employees of such employer who are employed in an industry affecting commerce[.]

29 U.S.C. § 186(a).  Caterpillar is an employer in an industry that affects commerce and the grievance chairmen are representatives of Caterpillar's employees.  On the face of § 302(a), then, Caterpillar's wage payments to them would appear to be unlawful.  Section 302(c), however, provides that
[t]he provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer . . . to any representative of his employees, . . . who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer[.]

29 U.S.C. § 186(c)(1).  Thus, if the grievance chairmen receive their compensation "by reason of" their "service as employees," then Caterpillar's wage payments are lawful.

5

In _Trailways_, the employer agreed to continue making contributions to a joint union-management trust fund on behalf of employees who had taken leaves of absence to devote their time to full-time union positions.[2] There, the union argued that those payments could pass muster under § 302(c)(1), which permits payments to former employees "as compensation for, or by reason of, [their] service as . . . employee[s.]" The _Trailways_ court rejected that possibility as a matter of statutory construction, opining:

To the Union, the pension fund contributions made on behalf of former employees currently on leave to serve as union officials were earned solely "by reason" of their past service to Trailways. But for their past employment by Trailways, the Union contends, these officials would not be eligible for pension fund contributions; therefore, these payments are "by reason of their service as an employee of" Trailways.

A logical reading of the statute makes clear that the "payments to former employees' exemption" of § 302(c)(1) applies solely to payments made as "compensation or by reason of" the former employees <u>past</u> service to the employer. While the Union is correct in asserting that had these individuals never been Trailways' employees they would not be eligible for pension contributions made on their behalf, it does not therefore follow that the pension fund contributions made by Trailways pursuant to the collective

---

2. One issue before the court was whether the payments were lawful under § 302(c)(5), which grants an exception for payments to pension trust funds. The _Trailways_ court concluded, however, that the § 302(c)(5) exception applies only to current employees and held that the union officials did not fit that description because Trailways did not have sufficient control over their work and because their work was solely for the benefit of the union. 785 F.2d at 104-07.

6

bargaining agreement were made "in compensation for, or by reason of," their _former_ service to Trailways so as to fall within the § 302(c)(1) exception. Clearly, the statute contemplates payments to former employees for _past_ services actually rendered by those former employees _while they were employees of the company_. Just as clearly, however, the pension fund benefits paid on behalf of former employees serving as union officials while on leave from Trailways are not compensation for their past service to Trailways.

Id. at 105-06 (emphasis in original).[3]

Were we to follow Trailways, its holding would control our decision in this case. The grievance chairmen cannot be considered current employees of Caterpillar who are being compensated for their current services. The chairmen perform no services directly for Caterpillar. Instead, they handle grievances and other labor matters for the union, a situation that often places them in a position adverse to Caterpillar's. Section 302(c)(1) legalizes payments to current or former employees based on their "services" as employees, not their "status" as such. Thus, the mere fact that the chairmen remain on the Caterpillar payroll and fill out the appropriate forms and time sheets to get paid is legally irrelevant.

The union argues that, unlike the situation under subsection (c)(5) in Trailways, under subsection (c)(1) the

_____

3. In a footnote, the court noted that the pension contributions were based on the employees' current union salary, indicating that the payments were "geared to their contemporaneous services to the Union." Id. at 106 n.5 (emphasis deleted).

7

chairmen can be employees of both the union and the employer. It relies especially on NLRB v. Town & Country Electric, 116 S. Ct. 450, 456 (1995), in which the Supreme Court held that a paid union organizer who obtained a job in order to "salt" the workforce and organize for the union was still an employee within the meaning of the National Labor Relations Act. But there, the Court noted that the employee still performed services for the benefit and under the control of the employer, even though part of his time was spent organizing for the union. That situation is different from ours. Here the chairmen do nothing for Caterpillar's benefit.

Moreover, under Trailways we cannot conclude that the chairmen's salaries were payments to former employees "as compensation for" their past services as employees. The chairmen were already compensated for their production line work long ago in the form of wages and vested benefits. A fair reading of Trailways does not support a finding that the payments at issue here somehow "related back" to these former employees' services on the factory floor.

B.

Nevertheless, after careful consideration and reargument before the in banc court, we believe that Trailways was wrongly decided and tends to subject innocuous, bargained-for

8

and fully disclosed payments to the criminal sanctions of the LMRA.

We have no difficulty with the Trailways holding regarding "current employee" status. See 785 F.2d at 106-07. We also believe that the salary payments to these union officials were not in compensation for their past services rendered as production employees. Our disagreement is with the Trailways court's conclusion that the "by reason of" language in § 302(c)(1) exempts only those payments for past services actually rendered while the former employee was still employed by the company. We think that statement misinterprets the text of § 302(c)(1) and does nothing to further the policy objectives Congress had when it enacted the LMRA half a century ago.

The Trailways test would be quite appropriate if § 302(c)(1) referred only to payments as compensation for past services. It is difficult indeed to comprehend how years, even decades, of paid union leave can realistically be thought of as compensation for time spent on the factory floor. The Trailways court, however, applied the same test to the statute's "by reason of" language; with that we can no longer agree.

First of all, Congress chose specifically to exempt payments in "compensation for" or "by reason of" an employee's service. By so doing, it must be presumed to have intended that certain payments would be legal, even though they were not, as Trailways recites, "for past services actually rendered by those

former employees while they were employees of the company." Id. at 106 (emphasis deleted). Nevertheless, the Trailways court, without any explanation, conflated the two phrases and developed a unitary test for whether former employee compensation is permissible.

Under the Trailways test, there are three requirements for a "former employee" payment to qualify for the § 302(c)(1) exemption:

(1) It must be for past, not present, services;

(2) the services must be actually rendered; and

(3) the services must have been rendered while the payee was still an employee.

Under this standard, the chairmen's wages fail the Trailways test, because the payments are not for services actually rendered to the company while they were still employees. Indeed, under Trailways, it appears that pay or continuation of benefits for time spent serving on a jury or in the National Guard would be illegal.

Likewise, even the "no docking" provisions of many collective bargaining agreements, including the Caterpillar-UAW contract here, fail to meet the Trailways standard. Under a no-docking clause, the employer agrees that shop stewards may leave their assigned work areas for portions of a day to process employee grievances without loss of pay. By paying production workers for the part-time hours when they leave their regular duties , the company is paying for services not actually rendered

10

for it, since those employees are already receiving their regular hourly wages and benefits for their production line work.  Yet, no-docking arrangements have been consistently upheld by the courts as not in violation of § 302, see NLRB v. BASF Wyandotte Corp., 798 F.2d 849, 854–56 (5th Cir. 1986); BASF Wyandotte Corp. v. Local 227, 791 F.2d 1046 (2d Cir. 1986); Herrera v. International Union, UAW, 73 F.3d 1056 (10th Cir. 1996), aff'g & adopting dist. ct. analysis, 858 F. Supp. 1529, 1546 (D. Kan. 1994); Communications Workers v. Bell Atlantic Network Servs., Inc., 670 F. Supp. 416, 423–24 (D.D.C. 1987); Employees' Independent Union v. Wyman Gordon Co., 314 F. Supp. 458, 461 (N.D. Ill. 1970), and Caterpillar does not even seek to have the contract's no-docking clause declared illegal.  Moreover, as the union points out, it would be strange indeed if Congress intended that granting four employees two hours per day of paid union leave is permissible, while granting a single employee eight hours per day of that same leave is a federal crime.

We believe that the payments at issue here, while they were not compensation for hours worked in the past, certainly were "by reason of" that service.  We reach this conclusion because the payments arose, not out of some "back-door deal" with the union, but out of the collective bargaining agreement itself.  Caterpillar was willing to put that costly benefit on the table, which strongly implies that the employees had to give up something in the bargaining process that they otherwise could

11

have received.  Thus, every employee implicitly gave up a small amount in current wages and benefits in exchange for a promise that, if he or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary.[4] As our colleague Judge Becker pointed out, dissenting in Trailways:

> The collective bargaining agreement contains the terms of workers' employment with Trailways;  each of the benefits the workers receive under that collective bargaining agreement are part of the consideration for their services at Trailways.  In addition to the standard terms for wages, overtime pay, and insurance, the collective bargaining agreement provides that persons who take a leave of absence to work as union officials have a right to reinstatement at Trailways after their union service and retain their seniority during their absence.  The collective bargaining agreement also provides that the employer will make payments into the union's pension fund while the employee is on leave.  Although these contributions are made during the leaves of absence, the employer's promise to pay them is nonetheless a term of the collective bargaining agreement and therefore a part of the consideration for work performed as a Trailways employee. There is no reason for distinguishing the pension fund payments from any of the other terms of the collective bargaining agreement.  Like wages, overtime, insurance, or accrued seniority, the pension fund payments are consideration for services rendered and, as such, are permissible under § 302(c)(1).

Trailways, 785 F.2d at 109 (Becker, J., dissenting).

---

4.  We do not mean to imply that an employee hired after a collective bargaining agreement could not be elected chairperson because he or she never "agreed" to an implicit wage reduction. Rather, like any other term of a labor agreement, it would be binding on all employees, whenever hired, until the expiration of the contract.

We find this line of reasoning persuasive. Indeed, it has been taken by a number of decisions reached after Trailways. See United States v. Phillips, 19 F.3d 1565, 1575 (11th Cir. 1994) (§ 302(c)(1) satisfied when former employee's entitlement to payments vests before he or she goes out on leave, but not after); Toth v. USX Corp., 883 F.2d 1297, 1301-04 (7th Cir. 1989) (criticizing Trailways and opining that "[o]ne obvious instance in which continuing payments constitute recompense for past services is when those continuing payments were bargained for and formed part of a collective bargaining agreement."); IBEW v. National Fuel Gas Dist. Corp., 16 Employee Benefits Cases 2018, 2020-21 (W.D.N.Y. 1993) (same); Bell Atlantic, 670 F. Supp. at 421-22 (same). We are aware of no currently valid opinion that follows the Trailways holding.

Caterpillar maintains that, under the reasoning we have utilized, employers and unions can themselves decide what is legal regardless of federal law by agreeing in a labor contract to a particular course of conduct. Our point, however, is not that a collective bargaining agreement can immunize unlawful conduct, but that: (1) under § 302(c)(1), the lawfulness of the conduct ab initio turns on whether the payment is "owed because of . . . service as an employee"; and (2) what is "owed" depends on the terms of the contract. Put differently, the contract does not immunize otherwise unlawful subjects but, by defining the basis for the payments, speaks directly to the question posed by

the statute as to whether the payments are "compensation for, or by reason of . . . service as an employee."

We also believe that any attempt to distinguish "no docking" provisions from the payments at issue here is unpersuasive. We perceive no distinction between union officials who spend part of their time (which may be quite substantial) in adjusting grievances from the type of employees who are involved here. Instead, "the nature of the absences and the payments made by the employer owning them is the same." Trailways, 785 F.2d at 111.

III.

In sum, we simply do not view the payments at issue here as posing the kind of harm to the collective bargaining process that Congress contemplated when it enacted the LMRA. Section 302 of that statute was passed to address bribery, extortion and other corrupt practices conducted in secret. See Trailways, 785 F.2d at 110 (Becker, J., dissenting). These expanded "no-docking" provisions, in contrast, are contained in the collective bargaining agreement on which each rank-and-file employee has the opportunity to vote. Thus, the officials receiving the payments can be held accountable to the membership. See Toth, 883 F.2d at 1304. Without explicit statutory direction from Congress, we cannot condemn these payments as criminal. Accordingly, we will reverse.

14

MANSMANN, J., dissenting, with whom Judge Greenberg joins.

In suggesting that "innocuous, bargained for and fully disclosed payments" from an employer to an employee representative should be lawful, the majority has placed its own policy objectives above plain language. By its own terms, the "by reason of" exception of 29 U.S.C. § 186(c)(1) simply does not include payments made to an employee representative merely because the payment is included in a collective bargaining agreement and the representative worked for the employer at one time. The plain language of the section 186(c)(1) exception is supported by the legislative history and purpose of the exception, and the majority's conclusion is at odds with important federal policy. Because I believe that the payments at issue in this case do not fall within the exception of section 186(c)(1), I respectfully dissent.

## I.

Where statutory language is plain, we must enforce that language according to its terms. Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary, 93 F.3d 103, 108 (3d Cir. 1996); see also United States v. Ron Pair Enters., Inc., 489 U.S.

15

235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., ___ F.3d ___, ___, 1996 WL 708610, at *5 (3d Cir. Dec. 10, 1996) (unless literal application will produce absurd result, plain meaning is conclusive).  It is for Congress, not the courts, to create exceptions or qualifications at odds with the LMRA's plain terms.  Packard Motor Car Co. v. NLRB, 330 U.S. 485, 490, 67 S.Ct. 789, 792, 91 L.Ed. 1040 (1947).

Section 302(a) of the LMRA, 29 U.S.C. § 186(a), on its face, makes it unlawful for any employer to pay any money or thing of value to any representative of its employees.  As the majority recognizes, section 302(a), standing alone, prohibits the payments at issue in this case.  Maj. Op., at 4-5.

Section 302(a) contains several exceptions.  Section 302(c)(1), 29 U.S.C. § 186(c)(1), renders section 302(a) inapplicable in respect to any money or other thing of value payable by an employer "to any representative of his employees, who is also an employee or former employee of such employer, as compensation for, or by reason of, his services as an employee of such employer."

The majority concedes that the payments at issue in this case are not payments to a current or former employee "as compensation for . . . his services."  Maj. Op., at 8.  The sole issue, then, is whether the payments to a former employee, who presently works as a grievance chairperson for the union, are

16

made "by reason of . . . his services as an employee of such employer."  Contrary to the position of the majority, I must conclude that the language of section 302(c)(1) is plain and does not encompass the payments at issue here.

The "by reason of" exception of section 302(c)(1) simply recognizes that current and former employees might have a right to receive payments from their employers that arise from their services for their employers but that are not properly classified as "compensation."  The "by reason of" exception includes pensions, 401(k) plans, life and health insurance, sick pay, vacation pay, jury and military leave pay, and other fringe benefits to which all employees may be entitled "by reason of" their service.  See United States v. Phillips, 19 F.3d 1565, 1575 (11th Cir. 1994) ("by reason of" exception applies to fringe benefits "such as vacation pay, sick pay, and pension benefits"), cert. denied, ___ U.S. ___, 115 S.Ct. 1312, 131 L.Ed.2d 194 (1995); BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union, AFL-CIO, 791 F.2d 1046, 1049 (2d Cir. 1986) ("by reason of" payments include "vacation pay, sick pay, paid leave for jury duty or military service, pension benefits, and the like"); see also Toth v. USX Corp., 883 F.2d 1297, 1303 n.8 (7th Cir.) (severance pay and payments to disabled employees are "by reason of" former employment), cert. denied, 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989).  Although not properly called

17

compensation, "by reason of" payments "arise from" the employee's services for the employer.

Without the section 302(c)(1) exception, these payments would be illegal if paid to any employee or former employee who also worked for the union. Thus, an employee who worked full time for the company, but who held a part-time position with the union (a practice permitted by the Supreme Court's decision in NLRB v. Town & Country Elec., Inc., ___ U.S. ___, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995)), would be unable to be paid his salary and could not receive fringe benefits -- despite working full time. Section 302(c)(1) plainly exists to enable company employees to obtain what is rightfully theirs. In other words, the section 302(c)(1) exception does not entitle union representatives to receive payments because of their service for the union; the exception allows union representatives to receive payments in spite of their current service for the union.

The key, however, is that the employee must receive the compensation or other payment because of his or her service for the employer. See, e.g., Phillips, 19 F.3d at 1575 ("by reason of" payments "from an employer to a union official must relate to services actually rendered by the employee"); id. (under plain meaning of exception, "payment given to former employee must be for services he rendered while he was an employee"); BASF Wyandotte Corp. v. Local 227, 791 F.2d at 1049 ("by reason of" payments are those "occasioned by the fact that the employee has

18

performed or will perform work for the employer, but which is not payment directly for that work"); Reinforcing Iron Workers Local Union 426 v. Bechtel Power Corp., 634 F.2d 258, 261 (6th Cir. 1981) (under "literal construction" of section 302, payment to industry steward who performs services for union, not employer, are unlawful). The payments at issue in this case are entirely unrelated to the representatives' services for the employer. I believe that the plain language of the section 302(c)(1) exception does not encompass the payments at issue here and that we must affirm the judgment of the district court.[5]

5. The majority overstates the effect of our decision in Trailways Lines, Inc. v. Trailways, Inc. Joint Council, Amalgamated Transit Union, 785 F.2d 101 (3d Cir.), cert. denied, 479 U.S. 932, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986).

Section 302(c)(1) states that all payments made to union representatives -- whether they are in direct compensation for services (wages) or merely by reason of those services (vacation pay, jury pay, et cetera) -- must somehow relate to those individuals' services for the employer. The Trailways opinion did not merge "compensation for" and "by reason of" as the majority suggests; it does not dispute the fact that "compensation for" and "by reason of" complement each other and that the "by reason of" exception covers certain payments that are not truly compensation. Instead, in Trailways we recognized that certain payments to former employees may no longer be justified once the individual stops performing services for the employer.

This makes sense. For example, it is apparent that jury-duty pay is "by reason of" an employee's services to the employer. It would be strange indeed if a former employee who retired five years ago could demand to be paid by the employer for his upcoming jury duty. As Trailways recognizes, payments to former employees, whether as compensation for or by reason of their former services, must be related to that former service. Just as former employees are no longer entitled to "by reason of" pay such as jury-duty pay, they should not be entitled to payments for performance of union work that is entirely unrelated to their former service. Accordingly, I see no reason to reverse our decision in Trailways.

II.

Because the plain language of the "by reason of" exception of section 302(c)(1) does not contemplate the payments at issue here, I would affirm the judgment of the district court without further discussion. Nonetheless, as I now digress briefly to relate, the legislative history and the purpose of section 302 support my conclusion that the payments at issue are unlawful.

As the majority recognizes, section 302 is a conflict-of-interest statute that is designed to eliminate practices that have the potential for corrupting the labor movement. Maj. Op., at 13; see Phillips, 19 F.3d at 1574. As the majority also recognizes, Congress was concerned about, inter alia, bribery and other secret, back-room agreements between employers and employee representatives. See Toth, 883 F.2d at 1300.

The majority does not go far enough, however. Recognizing that "any person in a position of trust" must not "enter into transactions in which self-interest may conflict with complete loyalty to those whom they serve," Congress stated that "no responsible trade union official should have a personal financial interest which conflicts with the full performance of his fiduciary duties as a workers' representative." S. Rep. No. 187, 86th Cong. 1st Sess., reprinted in 1959 U.S.C.C.A.N. 2318, 2330-31 (quoting ethical practices code of American Federation of

20

Labor and Congress of Industrial Organizations).[6] Congress desired to close the loopholes "which both employer representatives and union officials turned to advantage at the expense of employees." Id. at 2330.

When he introduced section 302 in 1947, Senator Ball expressed a concern that even negotiated payments from employers might "degenerate into bribes." 93 Cong. Rec. 4805 (1947), reprinted in II NLRB Legislative History of the Labor Management Relations Act, 1947, at 1305 (1948) (discussing welfare funds). Senator Ball stated that absent section 302, "there is a very grave danger that the funds will be used for the personal gain of union leaders." Id. Senator Byrd echoed the concerns of Senator Ball, noting that funds from the employer should not be "paid into the treasuries of the labor unions." Id. According to Senator Pepper, unless authorized in writing by each individual employee (in the form of dues check-off), "union leaders should not be permitted . . . to direct funds paid by the company . . . to the union treasury or union officers." Id. (quoting committee report).

---

6. I rely on the legislative history of the Labor-Management Reporting and Disclosure Act of 1959 (an act that strengthened section 302), instead of the official history of the Labor Management Relations Act of 1947 (the act that contained section 302), because the Congressional Comments to the Labor Management Relations Act do not include a discussion of the provisions at issue here. See H.R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 66-67, reprinted in 1947 U.S.C.C.A.N. 1135, 1173. In the text, I include the comments of three senators made prior to the passage of section 302 that were not included in the official conference report.

21

Section 302 therefore exists to prohibit "all forms of extortion and bribery in labor-management relations." BASF Wyandotte Corp. v. Local 227, 791 F.2d at 1053 (emphasis supplied) (quoting S. Rep. No. 187, 86th Cong. 1st Sess. 13, reprinted in 1959 U.S.C.C.A.N. 2318, 2329). Congress was concerned with corruption through both (1) bribery of employee representatives by employers and (2) extortion by those representatives. Toth, 883 F.2d at 1300 (citing legislative history and cases). Congress explained:

> The national labor policy is founded upon collective bargaining through strong and vigorous unions. Playing both sides of the street, using union office for personal financial advantage, undercover deals, and other conflicts of interest corrupt, and thereby undermine and weaken the labor movement. . . . The Government . . . must make sure that the power [to act as exclusive bargaining representative] is used for the benefit of workers and not for personal profit.

S. Rep. No. 187, 86th Cong. 1st Sess., reprinted in 1959 U.S.C.C.A.N. 2318, 2331.

Thus, Congress was not merely concerned about secret, back-room deals. Congress was concerned about any form of payment that could upset the balance between labor and management. The payments at issue in this case do exactly that. They create a conflict of interest for union negotiators who may agree to reduced benefits for the employees in exchange for financial support for the union.

22

For example, let us assume that ABC Corporation and the union are engaged in difficult negotiations over a pension plan. Also assume that the employer was stonewalling on this issue, that the union had the "correct" position, and that the company could have accepted the union's proposal without suffering noticeable financial impact. Assume ABC said to the union negotiator: "I know your local is having financial trouble. We will pay the salaries of the grievance chairmen if you stop pushing for this pension plan." The negotiator, who knows that her local can no longer pay the full salaries of all the grievance chairmen, agrees, and the pension plan is dropped in favor of the financial security of the union. The agreement is included in the bargaining agreement, and both the union and ABC effectively "sell" the agreement to the employees, who ratify it (not aware that the pension plan was sacrificed in this way). According to the majority, this scenario is perfectly lawful because it was included in the agreement. According to the language, legislative history and purpose of section 302, however, this scenario represents just what Congress sought to avoid.

## III.

As the majority concedes, the grievance chairmen in this case do not perform <u>any</u> services <u>whatsoever</u> for Caterpillar. Maj. Op., at 7. Instead, the chairmen perform services

23

exclusively for the union.  The majority concludes, however, that payments to such union employees are "by reason of" the employees' services to the employer.  First, the majority reasons that such payments were negotiated and appear in the collective bargaining agreement.  Second, the majority states that, because each employee must "give up something" in negotiations with the employer so that these payments may be included in the agreement, such payments are somehow "by reason of" the employees' service for the employer.  Finally, the majority contends that the payments at issue in this case are no different than so-called "no-docking" payments made to current employees who process employee grievances during working hours.  I do not believe that the majority's reasoning withstands scrutiny.

The majority first relies on the fact that the payments were negotiated and included in the collective bargaining agreement.  Maj. Op., at 11-13.  Simply including a payment provision in a collective bargaining agreement does not, however, make the payment "by reason of" an employee's prior service.

Section 302(a)(1) provides that it shall be unlawful for any employer to "agree to pay" any money to any representative of any of his employees.  29 U.S.C. § 186(a)(1).  Thus, actual payments to union representatives are prohibited, but so are agreements to pay union representatives.  The majority places special emphasis on the fact that the payments in this case were negotiated and were not, in effect, secret agreements.

24

Congress, on the other hand, was not concerned about the secrecy of these agreements.  If an agreement to pay is unlawful under section 302(a)(1), it is illogical to use that same agreement as a basis for finding that the resultant payment is lawful under section 302(c)(1).  Congress could easily have written an exception for payments by employers to union representatives pursuant to a collective bargaining agreement.  Instead, Congress limited its section 302(c)(1) exception to payments in compensation for or by reason of a representative's services for the employer.[7]

The majority does not find support in the statute (and indeed there is none) for its conclusion that bargained-for payments should be any more legal than secret agreements.  Without support, the majority asserts that an open agreement makes a payment "by reason of" services for the employer.  In so doing, the majority expands the exception such that the rule is rendered a nullity.[8]

7.  Senator Ball stated that the section 302(c)(1) exception allows payment of "money due a representative who is an employee or a former employee of the employer, on account of wages actually earned by him."  93 Cong. Rec. 4805 (1947), reprinted in II NLRB Legislative History of the Labor Management Relations Act, 1947, at 1304 (1948) (emphasis supplied).  It is apparent that Senator Ball did not contemplate that the narrow exception of section 302(c)(1) would someday encompass payments to a former employee that are entirely unrelated to the employee's services.

8.  I am also concerned that by placing so much emphasis on the fact that the payments were negotiated and included in the collective bargaining agreement, the majority effectively permits employers and unions to negotiate over otherwise unlawful subjects of bargaining.  It is beyond dispute that employers and unions cannot bargain over illegal subjects of bargaining.

The majority next reasons that since current employees must surely "give up something" during negotiations in exchange for an agreement by the employer to pay former employees to perform union work, then those payments must be "by reason of" their services. Maj. Op., at 11. The majority contends that "the employees had to give up something in the bargaining process that they otherwise could have received . . . in exchange for a promise that, if he or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary." Id.

Under the majority's reasoning, the union and the company could also agree to have the employer pay the salary of the international union's president and subsidize the pension fund of the union's permanent staff -- all because the company's employees might "give up something" during negotiations in the hopes that they too might someday receive those payments if elected to serve the union in the proper capacity. In deciding that "giv[ing] up something" is sufficient to bring the payments at issue in this case within the "by reason of" exception contained in section 302(c)(1), the majority has embarked on a slippery slope that will legitimize virtually any type of payment from the employer to the union so long as the payment is negotiated and included in the collective bargaining agreement.

(..continued)
Nonetheless, the majority uses the bargaining process to legitimize a payment that is otherwise prohibited by statute.

The majority's reasoning violates the plain language of section 302(c)(1) in yet another way.  This section allows an employer to make payments to a current or former employee by reason of "his" services as an employee.  29 U.S.C. § 186(c)(1). The majority reasons that the payments at issue in this case are lawful by reason of all of the employees' collective service. This is contrary to the plain meaning of the statute.  If a union official is to be paid by the employer, it must be by reason of that official's service to the employer -- not because of the service of others who might aspire to his position.  Indeed, if the collective bargaining agreement allowed, but did not require, that the grievance chairperson be a former employee of the company, then the company might find itself paying an individual who was never an employee of the company by reason of other employees' services for the company -- a result clearly not permitted by section 302(c)(1).  By relying on the collective service of the employees, the majority ignores the plain language of the statute.

I also fear that the majority's reasoning could be construed to apply to several situations which would defy logic. For example, let us assume that an individual applies for (and obtains) a job with the employer.  One day after beginning work, the individual is elected grievance chairperson.  For the next thirty years,[9] the individual serves as grievance chairperson and

9. While the agreement in this case may contain a time restriction, that restriction did not play any part in the

27

performs no services for the employer. Thus, the individual performed eight hours' worth of services for the employer, but was paid by the employer for thirty years. The majority's claim that this individual is being paid for thirty years "by reason of" his one-day service for the employer is illogical.

In another example, let us assume that two grievance chairpersons are elected on the same day. One ("Michael") worked for the employer for twenty years. The other ("Mary") was active in the union but never worked for the employer. Under the collective bargaining agreement in this case, the employer is required to pay Michael, but is prohibited from paying Mary. At present, both Michael and Mary perform exactly the same services, but Michael's prior employment (for which he was already fully compensated) entitles him to continued payment from the employer.[10]

The majority's reasoning also fails as a matter of logic in "open shops." In an open shop, not all employees

(..continued)
majority's reasoning. Therefore, I presume that an agreement that does not contain a time restriction will not be unlawful under the majority's decision.

10. Altering this example somewhat, let us assume that Michael worked for twenty years before being elected grievance chairperson, but that Mary worked one day. In this situation, the employer would be required to pay both Michael and Mary. Michael, however, "gave up" significantly more than Mary, as Michael worked for twenty years at reduced wages, while Mary only worked one day. The employer does not take into account what each individual gave up -- the employer considers what the collective group gave up. I contend that the employer may not do that under the plain terms of section 302(c)(1).

28

governed by the collective bargaining agreement will necessarily be members of the union. An employee who is not a member of the union (and who therefore cannot aspire to become a grievance chairperson) will nonetheless be forced to endure a lower salary or reduced benefits due to his co-workers' decision to "give up something." In addition, unions will be able to circumvent the problems that arise when some employees elect not to join the union or pay union dues -- they will seek agreements from the employer to subsidize representatives' salaries in exchange for reductions in pay or benefits. These agreements will be negotiated and ratified without the input of the non-union employees. Thus, an employee who elects not to pay union dues may nonetheless face reductions in salary or benefits so that the union (which he or she does not support) may prosper. The payments at issue here are surely not "by reason of" the non-union employees' services -- yet those same payments are made possible by the non-union employees' reduced salary and benefits.

## IV.

Finally, the majority contends that since no-docking provisions are lawful under section 302, the payments at issue here should also be lawful. The majority writes that "it would be strange indeed if Congress intended that granting four employees two hours per day of paid union leave is permissible,

29

while granting a single employee eight hours per day of that same leave is a federal crime."  Maj. Op., at 10-11.

In reasoning that the payments at issue here are analogous to no-docking payments, the majority assumes (without deciding) that no-docking provisions are lawful.  While some courts have so held, we have not yet addressed the lawfulness of no-docking payments.  Until we do so (and until we explain our reasons for finding such payments lawful), the majority should not analogize such payments to those at issue here.

Assuming that no-docking provisions are lawful, however, we are still not required to reach the conclusion that the payments at issue in this case must also be lawful.  Indeed, there are substantial differences between no-docking payments and the payments at issue here.  The primary difference is that no-docking payments are made to individuals who are current employees of the company currently performing services for the company.  In contrast, the payments at issue here are made to former employees of the company not performing any services for the company.

In BASF Wyandotte Corp. v. Local 227, 791 F.2d 1046, the Second Circuit observed that payments made to current employees for short absences (such as vacation pay, sick pay, or military leave pay) are all made to current employees "by reason of" their current, ongoing services for their employer.  The court then reasoned that payment to current employees for short

30

absences to perform union work is no different from vacation pay, sick pay, and military leave pay.  Id. at 1049.  Thus, no-docking payments made to current employees who occasionally performed union work during working hours should be treated the same as other payments for short term absences.

Importantly, the court recognized that each of these payments were made to persons whose entitlement to the payments was "by reason of" current service.  As the court noted, "no-docking provisions have relevance only to persons who are currently serving as employees."  Id. at 1049 n.1.  The common element linking sick pay and no-docking pay "is simply that the person to whom the employer makes payment is one who performs services as an employee."  Id. at 1049 (footnote omitted).  If we assume that no-docking payments are analogous to sick pay, we must conclude that they can only be made to current employees who perform services to their employers.  This makes sense -- former employees do not accrue sick pay or vacation pay.  Likewise, they should not accrue "union-work-time pay."  See also Phillips, 19 F.3d at 1575 n.18 (recognizing difference between no-docking provision and payments to non-employees who perform no work for company).

The majority cites several cases from our sister courts of appeals where courts concluded that no-docking provisions are lawful.  In several of those cases, however, the courts carefully distinguished no-docking payments from payments made to union

31

officials who did not perform work for the company.  In <u>BASF</u>

<u>Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union, AFL-CIO</u>,

791 F.2d 1046 (2d Cir. 1986), for example, the court stated:
[W]e do not suggest that section [302(c)(1)] would
        allow an employer simply to put a union
        official on its payroll while assigning him
        no work. . . .  [A] union official who,
        though on an employer's payroll, performed no
        service as an employee, would not be within §
        302(c)(1)'s exception.

<u>Id.</u> at 1050.  In another case cited by the majority, the court

agreed that payments to a union official put on an employee

payroll but not assigned any meaningful work would violate

section 302.  <u>NLRB v. BASF Wyandotte Corp.</u>, 798 F.2d 849, 856 n.4

(5th Cir. 1986).

        The majority also cites <u>Toth v. USX Corp.</u>, 883 F.2d

1297 (7th Cir.), <u>cert. denied</u>, 493 U.S. 994, 110 S.Ct. 544, 107

L.Ed.2d 541 (1989).  There the court of appeals stated:
At some point, it is conceivable that a bargain struck
        by the union and the employer might yet
        violate section 302 -- if, for example, the
        terms of compensation for former employment
        were clearly so incommensurate with that
        former employment as not to qualify as
        payments "in compensation for or by reason
        of" that employment . . . .

<u>Id.</u> at 1305.  As an example of a case that would violate section

302, the court stated that "fulltime pay for no service cannot

reasonably be said to be compensation 'by reason of' service as

an employee."  <u>Id.</u> (citing <u>BASF Wyandotte Corp. v. Local 227</u>, 791

F.2d at 1050).

Indeed, the distinction between no-docking payments and the payments at issue here is reinforced elsewhere in the labor laws. For example, 29 U.S.C. § 158(a)(2) provides that it shall be an unfair labor practice for an employer to contribute financial support to any labor organization. This rule contains one exception: "an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay." Id. Thus, while employers may allow employees to confer with their employer during working hours without loss of pay, the employer may not contribute financial support to the labor organization. The rule bans the payments at issue here; the exception allows no-docking provisions.

Other realities dictate that no-docking payments are simply not analogous to the payments at issue here. For example, employees subject to no-docking payments are more likely to do union work on an "as needed" basis. They are also more likely to be able to schedule grievance meetings and other union work at the mutual convenience of the employees and the employer. In contrast, the grievance chairmen in this case are paid full time regardless of whether there is any union work to be done. They are never available to perform services for the employer. Thus, the four individuals who spend two hours per day performing union work (from the majority's hypothetical) are less of a burden for the employer than one employee's absence all day every day.

V.

While the majority emphasizes its policy determination that bargained-for payments should not be unlawful, it does not discuss several compelling policy reasons why we should affirm the judgment of the district court.  These policy considerations go far beyond the need to avoid conflict of interest among union negotiators, a policy that is clear on the face of the statute and in the legislative history.

Initially, as the majority recognizes, the grievance chairperson will often take a position at odds with the position of management.  Maj. Op., at 7.  Indeed, the grievance chairperson is most needed when the employee's position is adverse to the employer's.  In order to be effective, the grievance chairperson often will fight zealously for the aggrieved employee and against the employer.  Meanwhile, the employer must pay the chairperson's salary.  It seems illogical to me to force the employer to pay the salary of an individual whose sole function is to oppose the employer.[11]

---

11.  I recognize that the word "force" may be strong since the employer need not agree to pay the grievance chairperson during negotiations.  Assuming that this pay practice is not unlawful, however, the practice undoubtedly constitutes a mandatory subject of bargaining.  NLRB v. BASF Wyandotte Corp., 798 F.2d 849, 852-54 (5th Cir. 1986).  Thus, if the employer refused to accede to such a pay provision, the employees could strike over this issue.
Indeed, those employees who may have the most influence in swaying other employees' opinions regarding strike decisions are probably the same individuals who are most likely to be elected to the position of grievance chairmen.  I envision the situation where an employee who seeks the position of grievance

34

Next, by sanctioning an agreement whereby the company pays grievance chairmen to perform services for the union, the majority unnecessarily creates uncertainty over whether the chairmen are employees of the union or employees of the company. In NLRB v. Town & Country Elec., Inc., ___ U.S. ___, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995), the Supreme Court addressed the question of who is an employee under the NLRA. The Court favorably cited several common definitions of "employee" -- including "person in the service of another . . . where the employer has the power or right to control and direct the employee . . . ." Id. at ___, 116 S.Ct. at 454 (citation omitted). Under this definition, a grievance chairperson appears to be an employee of the union. Citing an excerpt from the NLRA's legislative history, however, the Court noted that "employee" includes "every man on a payroll." Id. at ___, 116 S.Ct. at 454 (citation omitted). Since grievance chairmen remain on the company's payroll, perhaps they remain employees of the company. The majority does not decide whether the company or the union is the chairmen's employer.[12]

(..continued)
chairperson may seek to insure that his or her desired position is fully funded by the employer before he or she accepts the position -- even if that means encouraging a strike. Even the possibility that this might occur demonstrates the conflict of interest that will surely arise among those individuals who may seek the funded positions.

12.     This uncertainty will extend beyond cases arising under the NLRA. The Supreme Court recently held that, under Title VII of the Civil Rights Act of 1964, the test for deciding whether an employer "has" a particular employee is whether the employer has "an employment relationship" with the individual. Walters v.

35

The failure of the majority to decide whether the grievance chairmen are employees of the union or the employer may lead to numerous problems: Is a grievance chairperson considered part of the bargaining unit while on leave? Who will be liable if a grievance chairperson injures a third party while performing union work? Who will be responsible for providing a reasonable accommodation to a grievance chairperson with a disability who needs assistance performing her union job on the employer's premises? What if a grievance chairperson decides to take FMLA leave -- will his eligibility depend on whether the union is an

(..continued)
Metropolitan Educ. Enters., Inc., ___ U.S. ___, 117 S.Ct. 660, ___ (1997). The Court noted, however, that "the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll." Id. at ___, 117 S.Ct. at ___; see also Equal Employment Opportunity Commission Notice No. N-915-052, Policy Guidance: Whether Part-Time Employees Are Employees (Apr. 1990), at 24, reprinted in 3 EEOC Compl. Man. (BNA), at N:3311 (interpreting both Title VII and ADEA; while one's status as an employee is defined by examining the employment relationship, "[t]he payroll is a reliable indicator of those individuals who have an employment relationship with the employer and therefore are employees."). While grievance chairmen have an employment relationship with the union (indicating that the employer is the union), their relationship with the company is not completely severed, and they continue to appear on the company's payroll (indicating that the employer is the company).

I would note also that this is not a traditional dual-employer case where both the union and the company may be considered employers of the grievance chairmen. In the traditional dual-employer case, the individual performs services for both the company and the union and is paid by both the company and the union for the services performed for the respective payor. In this case, in contrast, the individuals perform services exclusively for one entity and are paid exclusively by another.

36

FMLA employer or whether the company is an FMLA employer?[13]  If a grievance chairperson is injured while performing union duties, will she nevertheless be entitled to disability or workers' compensation from the company?  May the company terminate, suspend or discipline a grievance chairperson if he engages in activity that would qualify for termination, suspension or discipline for other employees?  These questions are admittedly outside the scope of the narrow issue before us, but the majority's decision will assuredly lead to innumerable disputes about the proper classification of individuals who remain on the company's payroll without performing any services for the company.  If we affirm the judgment of the district court, however, it is clear that individuals who leave the company to work for the union are union employees, and the above questions resolve themselves.

The final and most important policy consideration not addressed by the majority is that federal labor policy demands that labor organizations and employers remain separate and

---

13.      The Senate Report accompanying the Family and Medical Leave Act of 1993 states that the term "employ" means "maintain on the payroll."  S. Rep. No. 103-3, 103d Cong. 1st Sess. 22, reprinted in 1993 U.S.C.C.A.N. 3, 24 (individuals on leaves of absence are considered employees "so long as they are on the employer's payroll.").  It would seem, therefore, that grievance chairmen are employees of the company for purposes of the FMLA. The Report also states, however, that Congress desired that "employ" under the FMLA mean the same as "employ" under Title VII.  As noted supra note 8, it is not clear whether the union or the company employs grievance chairmen for the purposes of Title VII.

distinct from one another.  The majority would sanction a pay practice that violates this important policy.

By enacting the labor laws as written, Congress insisted that the NLRB and the courts observe a sharp line between management and labor.  NLRB v. Hendricks County Rural Elec. Membership Corp., 454 U.S. 170, 192-93, 102 S.Ct. 216, 230, 70 L.Ed.2d 323 (1981) (Powell, J., concurring in part and dissenting in part).  Indeed, the dividing line between management and labor is "fundamental to the industrial philosophy of the labor laws in this country."  Id. at 193, 102 S.Ct. at 230; see also NLRB v. Bell Aerospace Co., Div. of Textron, Inc., 416 U.S. 267, 284-85 n.13, 94 S.Ct. 1757, 1767 n.13, 40 L.Ed.2d 134 (1974) (recognizing "traditional distinction between labor and management"); Packard Motor Car Co. v. NLRB, 330 U.S. 485, 494-95, 67 S.Ct. 789, 794-95, 91 L.Ed.2d 1040 (1947) (Douglas, J., dissenting) ("industrial philosophy" recognizes that management and labor are "basic opposing forces"); Cedars-Sinai Medical Center v. Cedars-Sinai Housestaff Assoc., 223 NLRB 251, 254 (1976) (Fanning, member, dissenting) ("underlying Federal labor policy . . . seeks to draw a line between labor and management").  Congress' desire to preserve the distinction between labor and management is evinced throughout the labor laws.  See, e.g., 29 U.S.C. § 158(a).  I believe that allowing an employer to provide financial support to a union, as the majority does here, blurs the important line between labor and management

38

and creates the potential for conflict that our labor laws do not tolerate.

## VI.

I recognize that labor organizations and employers have begun to embrace a more cooperative method of negotiating and dispute resolution, and I applaud labor-management efforts to retreat from the adversarial approach that has often marred the labor landscape in this country. I believe, however, that the payments sanctioned by the majority go too far. The financial support sought by the United Auto Workers in this case contravenes the longstanding tradition of separation of labor and management. I accept and encourage arm's length cooperation between labor and management. I cannot condone payments that threaten the independence of labor, create conflicts of interest for union negotiators, and violate the plain language of our laws. It is for Congress, not the courts, to determine if and when to permit labor organizations and employers to blur the line between them.

Accordingly, I respectfully dissent.

Caterpillar, Inc. v. International Union, et al.
No. 96-7012

ALITO, Circuit Judge, dissenting:

If I were a legislator, I would not vote to criminalize the payments to grievance chairmen that are at issue here. I

39

agree with the majority that these payments differ from the corrupt practices that usually figure in prosecutions under Section 302 of the Labor Management Relations Act, 29 U.S.C. § 186. Moreover, I am not certain that the Congress that enacted Section 302 would have chosen to outlaw such payments if it had focused specifically on that question.

Our job, however, is to interpret Section 302 as it is written. "The plain meaning of legislation should be conclusive, except in the `rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)). Here, the majority has not heeded the plain meaning of Section 302 and has not shown that the literal application of the statutory language would lead to a result that is "demonstrably at odds" with congressional intent. I therefore dissent.

As the majority acknowledges, Section 302 prohibits Caterpillar from paying the grievance chairmen unless those payments fall within one of the exceptions set out in Section 302(c), 29 U.S.C. §186(c). See Maj. Op. at 4-5. The exception at issue here is that contained in subsection (c)(1), which applies to "any money or other thing of value payable by an employer . . . to any representative of his employees, . . . who is also an employee or former employee of such employer, as

40

compensation for, or by reason of, his service as an employee of such employer."  29 U.S.C. § 186(c)(1).  The union argues that these payments fall within this exception for three separate reasons: (1) they are compensation for the grievance chairmen's current service as Caterpillar employees; (2) they are compensation for the grievance chairmen's former service as Caterpillar employees; and (3) they are made "by reason of" the grievance chairmen's former service as Caterpillar employees.  I briefly discuss each of these theories below.

## I.

### "As Compensation For" Current Service as a Caterpillar Employee

Although the union's primary arguments appear to be that the payments are made "as compensation for" or "by reason of" the grievance chairmen's past service as regular Caterpillar employees, the union also maintains that these payments are legal because they may be viewed "as compensation for" the grievance chairmen's work as current Caterpillar employees.  The union contends that the grievance chairmen, who are officially on leaves of absence from Caterpillar, are joint employees of Caterpillar and the union.  Among other things, the union notes that Section 302(c)(1) seems to contemplate such joint employment, since it permits an employer, under certain circumstances, to make payments to "any representative of his employees . . . who is also an employee . . . of such employer."

41

And the union argues that under National Labor Relations Board decisions the grievance chairmen qualify as joint employees.

I find it unnecessary to reach the question whether the grievance chairmen may be considered joint employees. Assuming that they are, I am convinced that Caterpillar's payments to them are not made "as compensation for" their service as current Caterpillar employees. In their capacity as grievance chairmen, they owe their complete loyalty to the workers they represent. See Dist. Ct. Op. at 14-15. They plainly work for the union and not for Caterpillar, and as the majority notes, their representation of the workers "often places them in a position adverse to Caterpillar's." Maj. Op. at 7.[14]

It is noteworthy that the union's excellent brief, while arguing strenuously that the chairmen are joint employees, makes little effort to show that the pay and benefits they receive are compensation for services performed for Caterpillar.

> The union's brief merely states:
> Caterpillar . . . realizes substantial benefit from the chairman's work. As the record shows, the chairman's job . . . is "to make sure that contract works" and if he succeeds, "everyone benefits -- the workers, the Company and its production needs, and the Union." App. 260.

Appellant's Br. at 48.

---

14.      I note that the union's brief acknowledges that "the Union certainly exercises primary control over the chairman and derives the primary benefit from his work." Appellant's Br. at 45.

This argument seems to me to obliterate the distinction, which is surely significant in the real world, between services performed for an employer and services performed for a union. I do not question the proposition that "everyone benefits" if the contract works; nor do I question the proposition that the grievance chairmen can help to make the contract work; but I do not think that it follows that the work that they do should be regarded under Section 302(c)(1) as services performed for Caterpillar. By this reasoning, everyone who helps to make the contract work, including presumably the union officers, could be viewed as working for Caterpillar. And since the union, as well as Caterpillar, benefits when the contract works, everyone who helps to make the contract work, including Caterpillar officers and supervisors, could be viewed as working for the union. Thus, the union's logic leads to preposterous results. Therefore, regardless of whether or not the chairmen may be technically considered to be joint employees of both Caterpillar and the union, I reject the argument that the payments in question here can be permitted on the theory that they constitute payments made to the chairmen "as compensation for" current services performed by them for Caterpillar. See Dist. Ct. Op. at 16 n.14 (because chairmen perform no functions on behalf of Caterpillar, payments are not for services rendered by chairmen to Caterpillar whether or not they can be considered current Caterpillar employees).

II.

"As Compensation For" Past Service as a Caterpillar Employee

I agree with the majority that the payments made to a grievance chairman do not constitute "compensation for . . . his service" as a company employee prior to his selection for a grievance position. This point can be demonstrated by considering the following situation. Suppose that an employee works for a number of years in a certain job category and receives during that period the same wages and other benefits as all the other employees in the same job category with the same seniority. Suppose that the employee is then selected to serve as a grievance chairman, and that he then entirely ceases his prior work and devotes his full time to grievance work, but continues to receive wages and benefits from the employer. It is plain that the wages and benefits that this employee receives after becoming a grievance chairman are compensation for his grievance work, not for the work that he did prior to his selection as a grievance chairman. If these payments were compensation for his prior work, then his compensation for that work would exceed that of the other employees with equal seniority who had labored in the same job category. Moreover, if the payments were compensation for previously completed work (in other words, if the payments had been fully earned before the employee's selection as a grievance chairman), the employee would

44

presumably be entitled to receive those payments if, instead of serving as a grievance chairman, he went fishing. But of course that is not the case.

Accordingly, I agree with the majority that the payments at issue here are not compensation for a grievance chairman's work prior to his selection for that position. As the majority states: "[t]he chairmen were already compensated for their production line work long ago in the form of wages and vested benefits." Maj. Op. at 7-8. "It is difficult indeed to comprehend how years, even decades, of paid union leave can realistically be thought of as compensation for time spent on the factory floor." Maj. Op. at 8-9.

## III.

### "By Reason Of" Past Service as a Caterpillar Employee

While the majority holds that the payments to the grievance chairmen are not "compensation" for their past service, the majority concludes that the payments are "payable . . . by reason of" the grievance chairmen's former service as Caterpillar employees. In reaching this conclusion, however, the majority does not explain with any specificity what it understands the phrase "by reason of" to mean. Nor does the majority take note of the clear meaning of that phrase in common parlance. If the majority paid more attention to the meaning of this language, it would be forced to recognize that the payments in dispute here

45

are not made "by reason of" the grievance chairmen's past service as Caterpillar employees.

    A. Dictionaries define the phrase "by reason of" to mean "because of" or "on account of." <u>See</u> <u>The Random House Dictionary of the English Language</u> 1197 (1967); 2 <u>The Compact Edition of the Oxford English Dictionary</u> 2431 (1971). When x is said to have occurred "by reason of" y, what is usually meant is that y was, if not the sole cause of x, at least the or a major cause. If y was simply a "but-for" cause but not a major cause of y, x is not said to have occurred "by reason of" y.

    This pattern of usage can be demonstrated by constructing sentences that use the phrase "by reason of" to refer to weak "but-for" causes. Such sentences invariably seem inapt and make it apparent that this use of the phrase "by reason of" is inappropriate. Here are some examples.

    President Clinton could not have become President had he not reached the age of 35, but it would be ridiculous to say that he became President "by reason of" having attained his thirty-fifth birthday.

    The Green Bay Packers could not have won Super Bowl XXXI without defeating the San Francisco Forty-Niners in the first round of the playoffs. However, it would seem quite odd to say that the Packers won the Super Bowl "by reason of" defeating the Forty-Niners.

The judges of this court almost certainly would not have been appointed if they had not graduated from law school. Yet it would seem very strange to say that the judges of this court were appointed "by reason of" having obtained law degrees.

I believe that these examples show that the phrase "by reason of x" refers at a minimum to a major reason for x, not simply a relatively minor "but-for" cause, and it therefore seems clear that Caterpillar's payments to the grievance chairmen are not made "by reason of" their prior service as Caterpillar employees. Such past service may be necessary for election as a grievance chairman (perhaps because Section 302 is thought to require this) and thus to the receipt of the payments at issue, but past service as a regular Caterpillar employee is certainly not the or a major cause for the payments.[15] One way to see this is to consider the fact that Caterpillar has thousands of former employees, but only a very few of them are ever selected as grievance chairmen. Since all have prior service for the company in common, yet only a handful become chairmen, factors other than prior service for the company must be much more important in influencing their selection.

15. In Trailways Lines, Inc. v. Trailways, Inc. Joint Council, Amalgamated Transit Union, 785 F.2d 101, 106 (3d Cir.), cert. denied, 479 U.S. 932 (1986), we noted that "[w]hile the Union is correct in asserting that had these individuals never been Trailways' employees they would not be eligible for pension contributions made on their behalf, it does not therefore follow that the pension fund contributions made by Trailways . . . were made 'in compensation for, or by reason of,' their former service to Trailways . . . ."

B.  It should be noted that nowhere in its briefs does the union urge that the phrase "by reason of" should be interpreted as requiring merely "but-for" causation.  In fact, the government's brief supporting the union agrees with my interpretation of "by reason of".  Gov't Br. at 12 (discussing "common understanding of 'by reason of,' as synonymous with 'because,' 'on account of,' owing to,' 'due to' etc.").  See also Appellant's Reply to Suppl. Br. at 3 ("there is no question" that "an employer may pay a former employee who is also a union official what he is owed because of his service as an employee and not one cent more") (emphasis in original) (quotation omitted).

Rather, the union's argument is that "the most natural reading [of `by reason of'] is that this phrase refers to payments which an individual earns the right to receive by serving as an employee but which are not, strictly speaking, remuneration for particular hours of work."  Appellant's Br. at 21 (emphasis added).  Accord id. at 34 ("so long as the right to such payments is earned by previously having performed `service to the employer'"); Appellant's Reply Br. at 18-19 ("`preexisting wage and benefit payments' for an employee elected to a full-time union position qualify as `payments by reason of' service as an employee, at least where the right to such payments has been collectively bargained and accrued as a result of the employee's work for the employer.") (emphasis added) (other emphasis

48

omitted); id. at 21 (the "by reason of" exception "leaves no room for payments which were not earned by prior service").  The union contends that the Eleventh Circuit's opinion in United States v. Phillips, 19 F.3d 1565 (11th Cir. 1994), cert. denied, 115 S. Ct. 1312 (1995), supports its position that Caterpillar's payments to the chairmen were "by reason of" their service as Caterpillar employees.  Phillips held that payments by a company to a union official were illegal if the union official "did not have a right to such payment before he severed his employment relationship with the company."  Id. at 1575.  The union relies (Br. at 37) on the court's explanation that "[w]hen an employee's right to a benefit has fully vested before the leave of absence begins, there is no danger of corruption when the employer delivers the benefit after that employee leaves the company to work for the union . . . ."  Id. at 1576.

    I agree that a payment from Caterpillar to a former employee now working as a grievance chairman would be legal under Section 302 if the chairman's right to that payment vested before he became a former employee.  This interpretation of the "by reason of" exception has been adopted by several other courts of appeals.  See Phillips, 19 F.3d at 1575; Toth v. USX Corp., 883 F.2d 1297, 1303 n.8 (7th Cir.), cert. denied, 493 U.S. 994 (1989).  Cf. BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union, 791 F.2d 1046, 1049 (2d Cir. 1986).

49

But the union's argument fails on its own terms here, because it is simply not true that the chairmen's rights to receive the payments at issue vested before they left Caterpillar's employ. On the contrary, their rights to receive these payments are conditioned upon their performance of certain duties in their current positions as grievance chairmen. If, as the union argues, the chairmen's rights to these payments were earned before their employment with Caterpillar terminated, then the chairmen could go fishing all day, every day, instead of processing grievances. Here, contrary to the government's argument, see Gov't Br. at 16, the payments made by Caterpillar are measured by the chairmen's current services for another employer, i.e., the union; they can earn as much as 46 hours' pay if they perform sufficient work, but if they perform less work they receive less and if they perform no work -- if they just go fishing -- they get nothing at all. In this respect, then, this case is identical to Trailways, and the union fails completely in its attempt to distinguish it on the ground that the chairmen are paid at a rate set by Caterpillar rather than by the union.

The basic problem with the union's argument is that it confuses an employee's eligibility for a payment with his right to it. The chairmen's prior service as employees of Caterpillar rendered them eligible to receive their Caterpillar salaries if they were elected as chairmen, but their prior service in no way gave them any right to receive any amount of money. In my view,

50

it is obvious that their prior service is not the sole or even a major reason for their receipt of the disputed payments. It thus cannot be said -- absent outright linguistic torture -- that the payments are made "by reason of" their prior service.

C. The majority's main argument in support of its "by reason of" holding is that under the collective bargaining agreement "every employee implicitly gave up a small amount in current wages and benefits in exchange for a promise that, if he or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary." Maj. Op. at 11. In other words, the majority views the collective bargaining agreement as providing each employee with the contingent right to receive future payments from the company after that employee's regular service has terminated (the contingencies being the employee's selection and subsequent work as a grievance chairperson). Moreover, the majority appears to argue that a bit of each employee's work under the collective bargaining agreement goes to pay for this contingent right, and the majority therefore reasons that if an employee is later selected as a grievance chairman and receives salary and benefits from Caterpillar, those payments are received "by reason of" the bit of that employee's past service that went to pay for this contingent right.

This argument is inventive -- but wrong. At the outset, it should be noted that the majority's argument logically

51

leads to strange results that the majority does not seem to contemplate.  The majority's argument is dependent on a grievance chairman's having "paid," while working as a regular employee, for the contingent right to receive future payments from the employer.  Thus, the argument cannot justify the initial negotiation of a collective bargaining agreement containing a provision such as the one in question here.  Suppose that a particular company and union had never before agreed on an arrangement under which the company would pay the grievance chairmen but that the company and the union then enter into such an arrangement.  The first group of employees chosen as grievance chairmen would not have previously made any "payments" to the employer in exchange for the contingent right to receive future wages and benefits from the employer.  Therefore, even under the majority's theory, the company's payments to the initial group of grievance chairmen would be illegal.  In other words, the majority's theory leads logically to the weird result that the company and the initial group of grievance chairmen would have to commit federal felonies in order to set in motion the type of arrangement that the majority sanctions.[16]

Moreover, although the majority postulates that regular employees "pay" for the contingent right to receive future compensation from the employer, it is by no means clear that this

16.  I would assume that the same would be true every time a new collective bargaining agreement took effect.

52

is true in most cases.  Obviously, each regular employee gives up wages and/or other benefits in exchange for the employer's payments to the grievance chairmen, but what each regular employee is chiefly "paying" for is not the contingent right to receive future payments from the employer but rather the current improvement in the handling of grievances that presumably results from the work of the grievance chairmen.  Indeed, under most circumstances, I suspect that virtually all, if not all, of the "payments" made by a regular employee in any particular year go to fund the employer's payments to the grievance chairmen in that year and not in future years when that employee might himself be a grievance chairman.[17]

---

17.  It makes sense that a regular employee should pay little if anything for the contingent right discussed in the text (as distinct from a current improvement in grievance handling) because, from the standpoint of a wealth-maximizing regular employee, this contingent right has little if any value.  This is so for two reasons.  First, this contingent right carries little prospect of financial gain.  A regular employee, if selected as a grievance chairman, will have to make future contributions of labor (performing the work of a grievance chairman) that are fully worth the wages and benefits that the employer will provide.  (Indeed, under the collective bargaining agreement before us here, a regular employee selected as a grievance chairman does not realize any gain in wages or benefits; he continues to receive the same wages and benefits as he did before.)  Second, this contingent right probably does little to increase an employee's chances of obtaining whatever non-monetary gratification may flow from doing the work of a grievance chairman as opposed to the work of a regular employee.  Assuming that employees in a particular bargaining unit who are willing to forgo $x per year in exchange for their employer's payments to the grievance chairmen would be willing to pay the same amount per year in increased union dues so that the union could make these payments, there will be approximately the same number of grievance chairman positions (and therefore approximately an equal chance of performing the work of a grievance chairman) whether or not the grievance chairmen are paid by the employer.

Finally and most importantly, postulating that each regular employee "pays" something for the contingent right to future compensation by the employer does not obviate the problem that past service as a regular employee is not the sole or even a major cause of this future compensation. Assuming that each regular employee makes such "payments" and that the payments are a but-for cause of any compensation that this employee may receive in the future as a grievance chairman, there are two other, more important causes of that compensation: selection as a grievance chairman and the satisfactory performance of the work of a grievance chairman on a daily basis. Thus, to say that a grievance chairman is paid year after year after year "by reason of" his past service as a regular employee makes no more sense than to say that a regular employee is paid year after year after year "by reason of" his having acquired the qualifications that were necessary for his original hiring.

For these reasons, it seems clear to me that the payments at issue in this case are made "by reason of" the chairmen's grievance work and not "by reason of" their prior service as regular employees. Consequently, these payments cannot be squeezed into the "by reason of" exception in Section 302(c)(1), 29 U.S.C. §186(c)(1), and I am therefore constrained to conclude that these payments are prohibited by the plain language of Section 302.

54

D. The majority also argues that by exempting payments made "by reason of" a former employee's past service in addition to payments made "as compensation for" that service, Congress must have intended that the two phrases refer to different things. I have no quarrel with this elementary principle of statutory interpretation, but I do not agree with the majority's application of it. The majority fails to acknowledge that three courts of appeals have construed "by reason of" to refer to a class of payments distinct from those covered by the "as compensation for" exemption, and that those courts have not adopted anything like the interpretation espoused by the majority. Because the Eleventh Circuit's discussion in <u>Phillips</u> precisely answers the majority's contention, I quote it at length:

Congress, in using the alternative formulations of "as compensation for" and "by reason of" in that provision, intended to remove from the statute's prohibitions two general categories of payments to employees: (1) wages, i.e., sums paid to an employee specifically "as compensation for" work performed; and (2) payments not made specifically for work performed that are occasioned "by reason of" the fact that the employee has performed (or will perform, in the case of a current employee) work for the employer. <u>The latter category includes employee "fringe" benefits, such as vacation pay, sick pay, and pension benefits.</u> Whether "as compensation for" or "by reason of" service to an employer, all payments from an employer to a union official must relate to services actually rendered by the employee for the section 186(c)(1) exception to apply. * * *

An employee's "right" to receive a "benefit" while on leave with the union has been upheld when it vested <u>before</u> the employee began the leave of absence . . . . <u>In contrast, the section 186(c)(1) exception does not apply when a company pays a union official who was a</u>

55

> former employee, but who did not have a right to such payment before he severed his employment relationship with the company.

19 F.3d at 1575 (first and third emphases added) (citations omitted). BASF Wyandotte Corp., on which Phillips principally relied, deemed "fring[e] benefits" such as "vacation pay, sick pay, paid leave for jury duty or military service, pension benefits, and the like" to be within the "by reason of" exception. 791 F.2d at 1049. Accord Toth, 883 F.2d at 1303 n.8 (severance payments are "by reason of" former employee's past service). These decisions are consistent with Trailways' holding that the payments to former employees contemplated by section 302(c)(1) are those that relate to "past services actually rendered by those former employees while they were employees of the company." Trailways, 785 F.2d at 106 (emphases in original).

Thus, the distinction between the "alternative formulations" is that "compensation" refers to wages paid for specific work performed, while "by reason of" refers to non-wage payments made after an employee becomes a former employee but earned while he or she was still an employee.[18] In contrast to

---

18. In Toth, the Seventh Circuit interpreted our decision in Trailways as resting on the proposition that "any compensation continuing beyond the time of an employee's 'past' employment could not be 'by reason of' [that] employment." 883 F.2d at 1302. While I am less confident than the Toth court that Trailways should be read so to hold, I agree with the Toth court that some payments made after the termination of the recipient's employment with the company can be made "by reason of" his or her prior employment. What is important is whether the recipient has a right to the payment before he or she leaves the company, not the date on which the payment is actually made or received. See

the Second, Seventh, and Eleventh Circuits, the majority here holds that the "by reason of" exception refers to wage payments that would not be made but for the recipient's prior service as an employee.

E.  The only justification for disregarding the plain meaning of the "by reason of" exception would be that it would produce "a result demonstrably at odds" with congressional intent or "would thwart the obvious purpose of the statute." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982) (quotation omitted), but the majority does not even attempt to make such a showing.  I see nothing that demonstrates that following the plain meaning of the statutory language would produce a result that is demonstrably at odds with Congress' intent.  I find nothing conclusive in the legislative history, and while I agree with the majority that the payments in question here are quite different from "bribery and extortion," Maj. Op. at 13, there are reasons, many of which are set out in Judge Mansmann's opinion, why Congress might have wished to preclude such employer payments.  I will simply note that this very case serves as an example of why Congress might have wanted to prohibit the payments at issue.  The majority's description of these payments as "innocuous" (Maj. Op. at 8) ignores the fact that Caterpillar's decision to stop paying the chairmen's salaries was
(..continued)
Toth, 883 F.2d at 1302 (criticizing Trailways for this reason).

57

designed to "put economic pressure on the Union" during the strike. (App. 144) Prohibiting company control over such payments furthers the goal of union independence by removing this weapon from the company's arsenal. In short, while I am unsure whether this prohibition is on balance desirable or undesirable, I am certain that it is far from absurd. The "explicit statutory direction" that the majority purports to find wanting (Maj. op. at 14) is plainly contained in the text of Section 302.

The history of "no docking" provisions, which seems to form the centerpiece of the union's submission, also does not persuade me to disregard the plain statutory language. "No docking" provisions differ, at least in degree, from the type of arrangement that is before us, and there are times in the law when differences in degree are dispositive. In any event, the legality of "no docking" provisions is unsettled; that question is not before us; and, like Judge Mansmann, I would not reach it here.

Since Section 302 is a criminal statute, I would apply the rule of lenity if I thought that the statutory language was ambiguous, see, e.g., Crandon v. United States, 494 U.S. 152, 158 (1990), but since I see no ambiguity, I find that rule inapplicable. See Reno v. Koray, 115 S. Ct. 2021, 2029 (1995)), (rule of lenity applies only "if, `after seizing everything from which aid can be derived,' we can make `no more than a guess as to what Congress intended'") (citations omitted). I would

58

therefore affirm the decision of the district court.  If this result is not desirable as a matter of public policy, the union and its amicus, the United States, surely understand how to seek correction in Congress.[19]

---

19.  Indeed, the government's amicus brief seems at places to amount to a request that we craft a legislative solution to the problem of collective bargaining agreements that call for employers to make payments to former employees who become union officials.  According to the government's brief, such payments may violate Section 302 if they are "incommensurate" with the recipient's former compensation as a regular employee, if the recipient negotiated the right to receive those payments, or if the recipient has not worked for the employer in his or her regular job for an extended period and is unlikely ever to return to such work.  U.S. Amicus Br. at 26-28.  These may be sensible rules, but I am unable to tease them out of the current language of Section 302.  They provide material for legislative, not judicial, consideration.