In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1152

TITAN TIRE CORPORATION OF
FREEPORT, INC.,

*Plaintiff-Counter Defendant-Appellant,*

*v.*

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, *et
al.*,

*Defendants-Counter Plaintiffs-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 10 C 50296 — **Frederick J. Kapala**, *Judge.*

ARGUED DECEMBER 5, 2012 — DECIDED NOVEMBER 1, 2013

Before MANION and SYKES, *Circuit Judges*, and DARROW, *District Judge*.[*]

MANION, *Circuit Judge*. Titan Tire Corporation of Freeport, Inc. ("Titan"), purchased a tire manufacturing facility in Freeport, Illinois, in late December 2005. In January 2006, Titan entered into a series of labor agreements with Local 745, the union which represented the Titan workers. After taking over the Freeport facility, Titan paid the full union salaries of Local 745's President and Benefit Representative even though they were on leave of absence from Titan and primarily working away from the Titan facility. But in October 2008, Titan informed the union that for two reasons it concluded such payments violated Section 302(a) of the Labor Management Relations Act ("LMRA"), which prohibits an employer from paying money to union representatives.[1] First, Titan concluded the payments were illegal because Local 745 also represented a bargaining unit at the Freeport School District but the President's full-time salary was being paid solely by Titan. And second, it believed the payments illegal because the union representatives were not working full-time from the Titan facility and were not subject to Titan's control.

---

[*] The Honorable Sara Darrow, U.S. District Court for the Central District of Illinois, sitting by designation.

[1] Section 302(a) of the LMRA provides that "[i]t shall be unlawful for any employer … to pay, lend, or deliver, or agree to pay, lend, or delivery, any money or other thing of value … to any representative of his employees who are employed in an industry affecting commerce." 29 U.S.C. § 186(a).

The union filed a grievance against Titan, arguing that Titan violated the various labor agreements when it stopped paying the President's and Benefit Representative's full-time salaries. It argued that such payments were exempt from the general prohibition of Section 302(a) by Section 302(c), because the President and Benefit Representative were current or former employees of Titan and the payments were "by reason of" their service as employees of Titan.[2] An arbitrator found that Titan made these payments "by reason of their former employment" at Titan, and thus that the payments were lawful under Section 302(c). The arbitrator ordered Titan to resume paying the President's and Benefit Representative's full-time salaries. Titan filed suit in federal district court to vacate the arbitrator's award and the union counterclaimed for enforcement of the award. The district court granted the union's motion, denied Titan's motion, and enforced the arbitrator's decision. Titan appeals.

This appeal presents an issue of first impression in this circuit, namely whether a company may legally pay the full-time salaries of the President and Benefit Representative of the union representing the company's employees. The Third Circuit, in a divided *en banc* decision, in *Caterpillar, Inc. v. Int'l Union, United Auto. Aerospace & Agric. Implements Workers of Am.*, 107 F.3d 1052 (3d Cir. 1997), held that paying the full-time

---

[2] Section 302(c) exempts from the general prohibition "any money or other thing of value payable by an employer to … any representative of [its] employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer." 29 U.S.C. § 186(c).

salaries of the union's grievance chairmen did not violate Section 302 of the LMRA because such payments were "by reason of" the union representatives' former employment at Caterpillar. Conversely, the dissents in *Caterpillar* concluded that the plain language of Section 302 barred the company from paying the full-time salaries of the union grievance chairmen, reasoning that such payments were not "because of" the grievance chairmen's prior service to Caterpillar, but rather because of their current work for the union. *Id.* at 1059 (Mansmann, J., dissenting); *id.* at 1069 (Alito, J., dissenting).[3]

The Ninth Circuit in *Int'l Ass'n of Machinists & Aerospace Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Grp.,* 387 F.3d 1046 (9th Cir. 2004), also disagreed with the majority's reasoning in *Caterpillar,* but nonetheless concluded that a company could legally pay a union's full-time "Chief Shop Steward" where the steward was subject to the employer's control and thereby still an employee of the company. The Second Circuit in *BASF Wyandotte Corp. v. Local 227, International Chem. Workers Union,* 791 F.2d 1046, 1049 (2d Cir. 1986), in upholding a no-docking provision, also indicated that an employer could not legally pay the full-time salary of a union employee, stating: "we do not suggest that [Section 302(c)(1)] would allow an employer simply to put a union official on its payroll while assigning him no work."

---

[3] The Supreme Court granted certiorari in *Caterpillar*. *Caterpillar, Inc., v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of AM., et al.,* 521 U.S. 1152 (1997). However, following briefing and oral argument, the parties settled and the Supreme Court dismissed the case. 523 U.S. 1015 (1998).

This circuit's closest precedent comes from *Toth v. USX Corp.*, 883 F.2d 1297 (7th Cir. 1989). In *Toth*, we held that former employees could accrue pension credit while working for a union, but we also recognized that at some point "the terms of compensation for former employment" could become "so incommensurate with that former employment as not to qualify as payments 'in compensation for or by reason of' that employment." *Id.* at 1305.

Such is the case before us today. Paying the full-time union salaries of Local 745's President and Benefit Representative is "so incommensurate with [their] former employment [at Titan] as not to qualify as payments 'in compensation for or by reason of' that employment." *Id.* Rather, these payments are "by reason of" the union's President's and Benefit Representative's service to Local 745 members, and those members include both employees working for Titan and employees working for the Freeport School District. We reach this conclusion based on the plain meaning of Section 302, although our holding also furthers the statutory purpose of preventing conflicts of interest. Because such payments are illegal, the arbitrator's decision violates explicit public policy and thus "we are obliged to refrain from enforcing it." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*, 461 U.S. 757, 766 (1983). Accordingly, we reverse the district court's decision and vacate the arbitrator's award.[4]

---

[4]  The Second and Ninth Circuits have both held that the payment of the full-time salaries of union grievance representatives does not violate Section 302 of the LMRA. However, as discussed in more detail in this opinion,

(continued...)

## I.

## BACKGROUND

Titan Tire Corporation of Freeport, Inc. ("Titan"), purchased a tire manufacturing facility in Freeport, Illinois, in late December 2005. Employees at the Freeport facility were represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"), and Local 745 (collectively "the union"). In January 2006, Titan entered into three related labor agreements with the union: (1) a Collective Bargaining Agreement ("CBA"); (2) a Benefits Agreement; and (3) an Understandings Outside the Agreement. (Collectively "labor agreements"). The relevant portions of those agreements are discussed shortly. *See infra* pp. 12–13.

Following Titan's purchase of the Freeport facility, Titan continued its predecessor's practice of paying Local 745's President and Benefit Representative their full-time salaries, plus benefits. The President's and Benefit Representative's salaries were set by Local 745's bylaws which were approved by members of Local 745. The bylaws provided that Local 745's "[p]resident's salary is 60 hours at the highest base rate in the

---

[4] (...continued)
these decisions adopt different approaches to this question of law. This opinion has been circulated under Circuit Rule 40(e) among all judges of this court in regular active service. A majority of the judges in active service did not wish to rehear the case en banc. Chief Judge Wood and Circuit Judges Rovner, Williams, and Hamilton voted to grant rehearing en banc. Judge Wood's dissent to the denial of rehearing follows.

plant," and "[t]he benefit representative salary is 48 hours at the highest pay rate of the plant."

When Titan purchased the tire facility, Steve Vanderheyden was serving as Local 745's President. Kevin Kirk took over as President in 2009. In 2006 and throughout the underlying litigation, Anthony Balsamo served as Local 745's Benefit Representative.

From 2006 through October 2008, Titan paid Vanderheyden and Balsamo their full union salaries. Then on October 31, 2008, Titan wrote to union president Vanderheyden and informed him that Titan would no longer pay the full-time salaries for Vanderheyden, Balsamo, and another union officer, whose pay is not at issue on appeal. In this letter, Titan explained that it believed that continuing to pay the salaries of the union representatives would violate Section 302 of the LMRA because Local 745 also represented school district employees[5] and because the President and Benefit Representative did not work out of the Titan facility and were not subject to Titan's control. *Id*.

While Titan ceased paying Vanderheyden and Balsamo their full-time salaries, it instead paid directly to Local 745 amounts it believed due under the various labor agreements for time the President and Benefit Representative worked on union business. Local 745 then began paying the President's and Benefit Representative's salaries; it also became responsi-

---

[5] As discussed in more detail below, *see infra* pp. 11–12, Local 745 represented both workers at Titan and several classifications of employees at the Freeport School District.

ble for the related federal tax withholding, unemployment taxes, and worker's compensation on their incomes. Titan, though, continued to offer Vanderheyden (and later Kirk) and Balsamo fringe benefits. Specifically, they remained eligible for employee benefits, including health, dental, and life insurance, and short-term disability coverage, although to participate in those insurance plans they had to write Titan a check for their share of the premiums and the payments did not come from pre-tax earnings. Titan also continued to make pension contributions and the President and Benefit Representative maintained their seniority at Titan.[6]

Local 745 filed a grievance challenging Titan's discontinuation of payments to Vanderheyden and Balsamo. The grievance went to arbitration. At arbitration, Local 745 argued that under the governing labor agreements and the parties' course of conduct, Titan was responsible for directly paying the President's and Benefit Representative's full salaries. In making this argument, Local 745 relied on several provisions from the governing labor agreements.

First, Local 745 relied on Article VII, Section 19 of the CBA, which provided:

> An employee who is designated Union representative shall be compensated at his current

---

[6] Article VIII, Section 3(e) of the CBA provided that: "An employee elected, selected, or appointed for duty as an officer, representative or employee of … the Local Union , … which assignment will take him from his employment with the Company, shall upon written request of the … Local Union receive a leave of absence for the period of his service. … Seniority shall accumulate throughout the period of his leave of absence."

> hourly rate for time lost from his regular shift
> as a result of attending scheduled grievance
> meetings with the Company. The maximum
> number of hours to be paid by the Company
> as provided in this paragraph shall be deter-
> mined for each week on the basis of fifteen
> (15) hours per week for one hundred (100)
> employees.

Second, Local 745 relied on the Benefits Agreement, which detailed the Benefit Representative's duties[7] and stated that "the Employee designated as Benefit Representative will be paid his current hourly rate for forty-eight (48) hours per week plus 2% of previous year's earnings as vacation pay. The employee will be considered to be on a leave of absence for the period of time he or she serves as Benefit Representative."

Third, the union relied on provisions contained in the Understandings Outside the Agreement. Here Local 745 pointed to provisions discussing the Benefit Representative and "union business time." In short, the Understandings

---

[7] The Benefits Agreement provided that: "The Benefit Representative will assist active bargaining unit employees, retired former employees and spouse[s] of employees and retirees when requested by such employees, spouses, or [Titan], in processing claims for benefits. The Benefit Representative will be involved in issues that relate to network administrators and providers, the review of administrative changes, procedures and policies of network administrators and provider withdrawals from a network that affect the adequacy of the network coverage. In addition, the Benefit Representative's role will include education of employees, retirees, surviving spouses and dependants on annual open enrollment, plan designs, and efficient utilization of medical and other benefit programs."

Outside the Agreement's provision discussing the Benefit Representative provided that Titan "will provide compensation for a Benefit Representative to be selected by the Local Union after consultation with the Company." The agreement also set out the Benefit Representative's pay, mirroring the terms provided in the Benefits Agreement, quoted above.

The provisions in the Understandings Outside the Agreement also discussed "union business time," and, in sum, set forth an agreement for the accounting of union business time. It explained that hours will be "accumulated and 'banked' by" Titan as provided in Article VII, Section 19 of the CBA. (As noted above, that provision set a maximum number of hours to be accumulated at 15 hours per 100 employees, per week.) It also stated that deductions from the account would be made for time spent on: union representation at a grievance meeting or arbitration; Grievance Negotiation Committee participation at a grievance meeting or arbitration; union investigation of a grievance or safety violation; grievant and union witnesses' attendance at a grievance meeting or arbitration; Union President's (or his replacement's) time; "[t]ime beyond 48 hours in a week paid to the Benefit Representative (or his replacement)"; and "[a]ny amount requested by Union for payment to Union members."

Titan for its part argued first that nothing in these agreements required it to pay Local 745's President and Benefit Representative their full-time salaries, but instead claimed the labor agreements merely provided for payments to the union for union business time. Titan further argued that if, under the labor agreements and its past practice, it had agreed to directly

pay the President and the Benefit Representative, the agreements were illegal and therefore could not be enforced.

At the arbitration hearing, the parties submitted as joint exhibits, among other things, the CBA, the Benefits Agreement, the Understandings Outside the Agreement, and the October 31, 2008, letter referenced above. The Union also presented Local 745's bylaws and Titan presented the Agreement between Local 745 and the Freeport School District, where Local 745 also represented a bargaining unit.

Vanderheyden testified at length during the arbitration proceedings on various matters. He confirmed that union members voted on and approved the CBA, Understandings Outside the Agreement, and the Benefits Agreement, excerpted above. And while the documents themselves were not "produced until after the ratification," Local 745 held a meeting for its members and provided a "full explanation of the content of all three of those documents."

Additionally, Vanderheyden testified in detail concerning his activities on behalf of Titan employees. He explained that under the bylaws he was a member of all committees and the head of the Grievance and Negotiating Committee. Vanderheyden testified that he devoted 55 to 60 hours a week on representational activities on behalf of Titan employees, although he explained that he was physically in the Titan plant for designated hours only on Tuesdays and Thursdays, about two hours in the morning and two hours in the afternoon. Vanderheyden added that on the other days (Mondays, Wednesdays, and Fridays), the Benefit Representative (Tony

Balsamo) worked out of the Titan plant for two hours in the morning and two hours in the afternoon.

Vanderheyden also explained the structure of Local 745. He testified that in addition to representing Titan employees, Local 745 also, since 1999, represented four classifications of employees working for the Freeport School District: teacher assistants; food service workers; instructional material technicians; and security monitors. There was only one collective bargaining agreement for those four units and about 170 Freeport School District employees were represented by Local 745.

Under Local 745's bylaws, the school employees elect their own leadership, with a unit chairperson, a separate grievance and negotiating committee, a recording secretary, and a separate steward structure. However, the arbitrator noted that under "the agreement between the Freeport School District and USW Local 745 the representational duties of the President and Benefit Representative extend to both Titan employees and to employees of the Freeport School District." And both Vanderheyden and Kirk testified at the arbitration hearing that they assisted the school district's unit chair, attended their monthly membership meetings, and were involved with the handling of some school district grievance proceedings. Vanderheyden had also been present for the negotiations with the Freeport School District and, in fact, had signed the collective bargaining agreement.

Although Vanderheyden (and later Kirk), as well as Balsamo, served both employees working for Titan and the Freeport School District, prior to the dispute at issue in this

case, they were paid entirely by Titan. The Freeport School District employees represented by Local 745 did not contribute to their salaries and the Freeport School District did not have an agreement with Local 745 to pay the President or Benefit Representative for time serving the District employees.

After the hearing, the arbitrator issued an opinion sustaining the union's grievance and ordered Titan to reinstate direct salary payments to the President and Benefit Representative. The arbitrator reasoned that Titan's practice of directly paying the President's and Benefit Representative's salaries for two and a half years was "enough time to invoke the doctrine of past practice." The arbitrator further concluded that such payments were "by reason of their former employment" with Titan and "in accordance with the collective bargaining agreement" and as such were legal under Section 302(c). The arbitrator added that "[t]he effect of the bargained-for payment is significant," totaling nearly $80,000 annually for the President and about $50,000 for the Benefit Representative. And that "[t]his savings of expense could result in either lower Union dues or at least no raise in Union dues," and thus "[t]he payment by the Company of the President's and Benefit Representative's salaries is therefore a direct benefit to the Union membership."

Titan filed suit in federal district court to vacate the arbitrator's award and the union counterclaimed for enforcement of the award. The parties then filed cross-motions for summary judgment. The district court denied Titan's motion for summary judgment and granted the union's motion for summary judgment, holding that salary payments to the President and Benefit Representative were not in violation of § 302 of the

LMRA. The district court found that the payments were made to former employees and reasoned that such payments were legal because they "were enshrined in the CBA, are not the product of a dangerously imbalanced bargain, and do not raise a potential for undue influence." Titan appeals.

## II.

### ANALYSIS

On appeal, Titan argues that this court should vacate the arbitration award requiring it to pay the full-time salaries of the union's President and Benefit Representative because such payments violate § 302 of the LMRA. "We review *de novo* a district court's decision on cross-motions for summary judgment, meaning that we review the arbitrator's decision as if we were the court of first decision." *United Food & Commercial Workers, Local 1546 v. Ill. Am. Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009) (internal citations omitted).

"Judicial review of arbitration awards is extremely limited." *Prate Installations, Inc. v. Chi. Reg'l Council of Carpenters*, 607 F.3d 467, 470 (7th Cir. 2010). And courts should not "review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam). Therefore, an arbitration award "must be enforced if it draws its essence from the collective bargaining agreement." *Chi. Newspaper Publishers' Ass'n v. Chi. Web Printing Pressmen's Union No. 7*, 821 F.2d 390, 394 (7th Cir. 1987) (internal quotation marks omitted).

Nonetheless, the Supreme Court has made clear that a reviewing court should vacate an arbitration award if the arbitrator's interpretation of the collective bargaining agreement was "contrary to public policy." *E. Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62 (2000). And "[i]f the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it." *W. R. Grace*, 461 U.S. at 766. The public policy must be "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general consideration of supposed public interests.'" *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)). A violation of a statute or some other positive law is the clearest example of a violation of public policy and "no arbitrator is entitled to direct a violation of positive law." *EEOC v. Ind. Bell Tel. Co.,* 256 F.3d 516, 526 (7th Cir. 2001) (en banc). *See also George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577 (7th Cir. 2001) (distinguishing between "a manifest disregard of the law," which does not provide a basis to overturn an arbitrator's decision, and an arbitrator's directive to "the parties to violate the law," which must be overturned by a court of law).[8]

---

[8] In *Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 584–89 (2008), the Supreme Court held that the grounds for vacating or modifying an arbitration award contained in the Federal Arbitration Act, 9 U.S.C. §§ 10–11, are exclusive and that contracting parties could not expand that list. The *Hall Street* Court did not overrule *Eastern Associated Coal* or *W.R. Grace,* both of which recognized a public policy exception to the general prohibition on overturning arbitrator awards. *See supra* at 15. Thus, *Eastern Associated Coal* and *W.R. Grace* still control. *See also Affymax, Inc. v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.,* 660 F.3d 281, 284–85 (7th Cir. 2011)

(continued...)

Moreover, "[o]nce [a] public policy question is raised, we must answer it by taking the facts as found by the arbitrator, but reviewing [the arbitrator's] conclusions de novo." *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*, 834 F.2d 1424, 1427 (8th Cir. 1987). And "the question of public policy is ultimately one for resolution by the courts." *W.R. Grace,* 461 U.S. at 766.

In this case, Titan maintains that its payment of the union's President's and Benefit Representative's full-time salaries violated public policy as defined by Section 302(a) of the LMRA. As noted above, Section 302(a) provides: "It shall be unlawful for any employer … to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value … to any representative of any of his employees who are employed in an industry affecting commerce. " 29 U.S.C. § 186(a). However, Section 302(c) exempts from this general prohibition "any money or other thing of value payable by an employer to … any representative of [its] employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer." 29 U.S.C. § 186(c).

Section 302 seeks to prevent employers from bribing union officials. *Toth*, 883 F.3d at 1300. It also seeks to prevent those representing employees from operating under conflicted

---

[8] (...continued)

(explaining that the principle in *George Watts,* that a court may set aside an award that directs the parties to violate the law, survives *Hall Street*).

interests and for personal profit. *See United States v. Kaye*, 556 F.2d 855, 865 n.12 (7th Cir. 1977).

The plain language of Section 302(a) would bar Titan's payment of the union's President's and Benefit Representative's salaries because they "represent[] … employees who are employed in an industry affecting commerce." 29 U.S.C. § 186(a)(1).[9] The union contends that Titan's payments are exempt from the general bar by Section 302(c) because the payments are to a "former employee"[10] "as compensation for, or by reason of, his service as an employee" of Titan. 29 U.S.C.

---

[9]   Titan contends on appeal that "[p]ayments by Titan Tire to the Local in lieu of keeping these full-time Union officials on the company payroll are equally unlawful; the statute prohibits payments to 'any labor organization' that represents the company's employees, as well" as payments to "any representative of any employee." Appellant Brief at 12 (quoting 29 U.S.C. § 186(a)(1)). The only issue before us, however, is whether to enforce or vacate the arbitrator's award and that award directed Titan to "reinstate direct payments to the President and Benefit Representative." Accordingly, that is the only question we address.

[10]   The union also argues that the payments are exempt under Section 302(c) because the President and Benefit Representative are "current employees" of Titan. The arbitrator, however, found that Titan paid the President's and Benefit Representative's salaries "by reason of their *former* employment." (Emphasis added.) He further found that the President and Benefit Representative performed no services that would qualify either as an employee of Titan. The arbitrator's findings of fact are not subject to review. *Garvey*, 532 U.S. at 509. And we could not overturn an arbitrator's factual findings, even if we thought them wrong. *Hasbro, Inc. v. Catalyst USA, Inc.*, 367 F.3d 689, 692 (7th Cir. 2004). In any event, the record, which we have fully reviewed, confirms the arbitrator's conclusion that the President and Benefit Representative were not current Titan employees.

§ 186(c). In support of its position, Local 745 relies heavily on *Caterpillar, Inc. v. UAW*, 107 F.3d 1052 (3d Cir. 1997) (en banc).

A.  *Caterpillar, Inc. v. UAW*, 107 F.3d 1052 (3d Cir. 1997)

In *Caterpillar*, the Third Circuit confronted the question of "whether an employer granting paid leaves of absence to employees who then become the union's full-time grievance chairmen violates § 302 of the Labor Management Relations Act, 29 U.S.C. § 186." *Id.* at 1053. The collective bargaining agreement in that case "contained a 'no-docking' provision allowing employees who were also union stewards and committeemen to devote part of their work days to processing employee grievances without losing pay, benefits or full-time status." *Id*. The CBA also "allow[ed] the union's full-time union committeemen and grievance chairmen to devote their entire work week to union business without losing pay. These employees [were] placed on leave of absence and [were] paid at the same rate as when they last worked on the factory floor." *Id*. While on leave of absence, the union committeemen and grievance chairmen conducted "business from the union hall, perform[ed] no duties directly for Caterpillar, and [were] not under the control of Caterpillar except for time-reporting purposes." *Id*.

Later, in the midst of a labor dispute in which the employees had returned to work without a contract, Caterpillar informed the union that it would no longer pay the grievance chairmen. *Id.* at 1053–54. The union filed an unfair labor practice charge with the National Labor Relations Board and Caterpillar countered with a suit in federal court seeking a

declaratory judgment that its payments violated § 302 of the LMRA. *Id.* at 1054.

A divided *en banc* court held that the payments were lawful under Section 302(c).[11] *Id.* at 1057. The court reasoned that while the grievance chairmen could not be considered current employees of Caterpillar and their salaries could not be considered "as compensation for" their past services as Caterpillar employees, paying the grievance chairmen their full-time salaries was lawful because such payments were "by reason of" their past services as employees of Caterpillar. *Id.* at 1055. The court:

> reach[ed] this conclusion because the pay-
> ments arose, not out of some "back-door
> deal" with the union, but out of the collective
> bargaining agreement itself. Caterpillar was
> willing to put that costly benefit on the table,
> which strongly implies that the employees
> had to give up something in the bargaining
> process that they otherwise could have re-
> ceived. Thus, every employee implicitly gave
> up a small amount in current wages and
> benefits in exchange for a promise that, if he

---

[11] The court in *Caterpillar* overruled its earlier decision in *Trailways Lines, Inc. v. Trailways, Inc. Joint Council of the Amalgamated Transit Union*, 785 F.2d 101 (3d Cir. 1986). The Third Circuit in *Trailways* had held that an employer's agreement to continue making contributions to a joint union-management trust fund on behalf of employees on leave of absence and working full-time for the union was illegal under § 302. *Id*. at 108.

> or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary.

*Id.* at 1056.

The court in *Caterpillar* further reasoned that "any attempt to distinguish 'no-docking' provisions from the payments at issue here is unpersuasive. We perceive no distinction between union officials who spend part of their time (which may be quite substantial) in adjusting grievances from the type of employees who are involved here." *Id.* at 1057. The court further added that "we simply do not view the payments at issue here as posing the kind of harm to the collective bargaining process that Congress contemplated when it enacted the LMRA. Section 302 of that statute was passed to address bribery, extortion and other corrupt practices conducted in secret." *Id*.

B.   By Reason Of Their Service As Former Employees

Based on *Caterpillar*'s analysis, the union maintains that Titan's payment of the full-time salaries to Local 745's President and Benefit Representative are exempt under Section 302(c) because those payments are "by reason of" their service to Titan as former employees. As discussed below, we disagree and instead find the reasoning of the *Caterpillar* dissents more persuasive.[12]

---

[12]   The Ninth Circuit in *BF Goodrich,* 387 F.3d 1046, also disagreed with the reasoning of *Caterpillar*. In *BF Goodrich,* also discussed *infra* pp. 38–42, the court held that BF Goodrich could legally pay the union's full-time "Chief

(continued...)

   To address the union's argument, we must first consider
the meaning of "by reason of" in Section 302(c). Initially, we
note that we agree with the majority in *Caterpillar* that the "by
reason of" language means something distinct from the "as
compensation for" language of Section 302(c). *Caterpillar*, 107
F.3d at 1055–56. The majority in *Caterpillar*, though, did not
inquire further on the meaning of that phrase. *See Caterpillar*,
107 F.3d at 1068 (Alito, J., dissenting) ("In reaching this
conclusion, however, the majority does not explain with any
specificity what it understands the phrase 'by reason of' to
mean.").

---

[12] (...continued)

Shop Steward" because he was subject to BF Goodrich's control and thereby
an employee. But while it upheld the payments to the Chief Shop Steward,
the Ninth Circuit disagreed with *Caterpillar*'s reasoning, stating: "We thus
see things somewhat differently than the Third Circuit in *Caterpillar*,
where—without analyzing whether the full-time union grievance chairmen
whose corporate payments were at issue there qualified as employees of the
company or really served as employees of the union, see 107 F.3d at 1065–66
(Mansmann, J., dissenting)—the court sanctioned the company's payments
to full-time representatives who worked from the union hall, outside any
meaningful corporate supervision (except for time-reporting requirements),
and who were classified as being 'on leave of absence' during the course of
their union work. *Id.* at 1053 (majority opinion)." *BF Goodrich*, 387 F.3d at
1059 (quoting *Caterpillar*, 107 F.3d at 1065–66 (Mansmann, J., dissenting)).
While *BF Goodrich* disagreed with *Caterpillar*'s reasoning, the Ninth Circuit
did uphold the payments to the Chief Shop Steward. It did so, though,
because the steward remained subject to the employer's control and was
thereby a current employee of BF Goodrich. Conversely, in this case, the
arbitrator concluded that the President and Benefit Representative were not
employees of Titan and that finding is not subject to review. *See supra* p.17
n.9.

While the majority in *Caterpillar* did not explain what it understood the "by reason of" exception to mean, the dissents in *Caterpillar* did analyze this preliminary question. First, Judge Mansmann explained:

> The "by reason of" exception of section 302(c)(1) simply recognizes that current and former employees might have a right to receive payments from their employers that arise from their services for their employers but that are not properly classified as "compensation." The "by reason of" exception includes pensions, 401(k) plans, life and health insurance, sick pay, vacation pay, jury and military leave pay, and other fringe benefits to which all employees may be entitled "by reason of" their service. … Although not properly called compensation, "by reason of" payments "arise from" the employee's services for the employer.
>
> Without the section 302(c)(1) exception, these payments would be illegal if paid to any employee or former employee who also worked for the union. Thus, an employee who worked full time for the company, but who held a part-time position with the union (a practice permitted by the Supreme Court's decision in *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85 (1995)), would be unable to be paid his salary and could not receive fringe benefits— despite working full time.

> Section 302(c)(1) plainly exists to enable company employees to obtain what is rightfully theirs. In other words, the section 302(c)(1) exception does not entitle union representatives to receive payments *because of* their service for the union; the exception allows union representatives to receive payments *in spite of* their current service for the union.

*Id.* at 1058–59 (Mansmann, J., dissenting) (citations omitted).

Judge Mansmann stressed that the key "is that the employee must receive the compensation or other payment *because of* his or her service for the employer." *Id.* at 1059 (emphasis added). She then concluded: "[t]he payments at issue in this case are entirely unrelated to the representatives' services for the employer. I believe that the plain language of the section 302(c)(1) exception does not encompass the payments at issue here." *Id*. at 1059.

We agree with Judge Mansmann's analysis and similarly conclude that the plain language of the section 302(c)(1) exception does not encompass the payments at issue here (the paying of Local 745's President's and Benefit Representative's full-time salaries) because such payments are not "by reason of" their service as former employees of Titan. Or in the words of Judge Mansmann, they are not *"because of"* their service to Titan. Rather, the President and Benefit Representative receive their full-time salaries *"because of"* their service to Local 745, which in this case includes not just their service to union

members working for Titan, but also to union members working for the Freeport School District as teacher assistants, food service workers, instructional material technicians, and security monitors.[13]

Then-Judge Alito in his separate dissent also analyzed the meaning of the "by reason of" language, *albeit* slightly differently. He explained that the majority's interpretation of 302(c)'s phrase "by reason of, his service as an employee of such employer" improperly seeks only a "but-for" causation, that is, "but-for" their status as former employees they would not be entitled to the full-time pay. *Id.* at 1068–69. But the phrase "by reason of" means "because of" or "on account of," and usually that means that it is a major cause. *Id*. He illustrated this point

---

[13]  The arbitrator in this case found that "the USW and the Teachers Union were scrupulous in keeping their affairs separate. … It appeared to me that the contact between offices of the USW and the Teachers Union was minimal at best and in more of an advisory role than as a direct union representative." The arbitrator's finding is questionable given that Vanderheyden testified that they did not keep records of hours worked for Titan employees and Freeport School District employees. It is also questionable whether negotiating and signing a collective bargaining agreement, as Vanderheyden did on behalf of the Freeport School District employees, can be considered minimal contact. We must, though, accept the arbitrator's findings of fact, even if we think them wrong. *Hasbro*, 367 F.3d at 692. However, even accepting the arbitrator's view that the union was scrupulous in keeping the Titan and Freeport School District affairs separate, the undisputed fact remains that Local 745's President and Benefit Representative served both groups of employees, but were paid solely by Titan. This circumstance alone distinguishes this case from *Caterpillar* and shows that their salaries were earned "because of" their current service to union members and not "by reason of" their former employment with Titan.

with some colorful examples, such as: "The Green Bay Packers could not have won Super Bowl XXXI without defeating the San Francisco Forty-Niners in the first round of the playoffs. However, it would seem quite odd to say that the Packers won the Super Bowl 'by reason of' defeating the Forty-Niners." *Id.* at 1069.

So too here. But for the President's and Benefit Representative's prior service as Titan employees, they would not be entitled to Titan paying their full-time union salaries. However, that merely establishes their "*eligibility*" for such payments, not their "*right*" to payment. *See id.* at 1070 ("The basic problem with the union's argument is that it confuses an employee's *eligibility* for a payment with his *right* to it.").

The majority in *Caterpillar* also attempted to characterize the current payments as being "by reason of" the employees' past service to the employer by postulating that "every employee implicitly gave up a small amount in current wages and benefits in exchange for a promise that, if he or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary." *Caterpillar*, 107 F.3d at 1056 (majority opinion). Similarly, the union in this case argues, "[b]y the same token, every Titan employee implicitly gave up a small amount of current wages and benefits in exchange for the promise that if he or she someday would be elected Local Union President or appointed to serve as the Benefit Representative, Titan would continue to pay his or her wages while on leave."

But as then-Judge Alito explained, "[t]his argument is inventive—but wrong." *Id.* at 1070 (Alito, J., dissenting). He

noted that "postulating that each regular employee 'pays' something for the contingent right to future compensation by the employer does not obviate the problem that past service as a regular employee is not the sole or even a major cause of this future compensation." *Id.* at 1070. Rather, "there are two other, more important causes of that compensation: selection as a grievance chairman and the satisfactory performance of the work of a grievance chairman on a daily basis." *Id*. Moreover, the majority's reasoning in Caterpillar, would mean current employees are "paying" now for the future right to receive their full salaries while on leave of absence to work for the union. *Id.* at 1070–71. In turn, then, "[t]he first group of employees chosen as grievance chairmen would not have previously made any 'payments' to the employer in exchange for the contingent right to receive future wages and benefits from the employer." *Id.* at 1071. Therefore, even under the majority's theory, "the company's payments to the initial group of grievance chairmen would be illegal." *Id*.

Additionally, *Caterpillar*'s reasoning (that every employee gave up a small amount in compensation now in exchange for the chance to later be paid to serve as a grievance chairperson), also wrongly equates paying fringe benefits to former employees for performing their past job with paying former employees their current salaries for working for the union. Courts have uniformly concluded that the "by reason of" exception of 302(c) allows union workers to receive fringe benefits earned during their prior service to an employer. *See United States v. Phillips*, 19 F.3d 1565, 1575 (11th Cir. 1994) ("by reason of" exception applies to fringe benefits "such as vacation pay, sick pay, and pension benefits"); *Toth v. USX Corp.*, 883 F.2d 1297,

1303 n.8 (7th Cir. 1989) (severance pay and payments to disabled employees are "by reason of" former employment); *BASF Wyandotte*, 791 F.2d at 1049 ("by reason of" payments include "vacation pay, sick pay, paid leave for jury duty or military service, pension benefits, and the like").

However, paying a former employee a salary to do *another* job for *another* employer is different in both kind and degree from paying fringe benefits to a former employee.[14] First, it is different in kind: Fringe benefits vest prior to an employee leaving his employer's service. As the Eleventh Circuit explained in *Phillips*, 19 F.3d at 1575: "An employee's 'right' to receive a 'benefit' while on leave with the union has been upheld when it vested *before* the employee began the leave of absence to work for the union as well as *before* the employer delivered the benefits." *See also Caterpillar*, 107 F.3d at 1072 n.5 (Alito, J., dissenting) ("[S]ome payments made after the termination of the recipient's employment with the company can be made 'by reason of' his or her prior employment. What is important is whether the recipient has a right to the payment before he or she leaves the company, not the date on which the payment is actually made or received."). Conversely, the President's and Benefit Representative's "right" to be paid their full-time union salaries arises only once those individuals are no longer employed by Titan and instead are working for the union. Thus, the right to full-time salary payments from

---

[14] Titan does not contend that it is illegal for it to continue providing fringe benefits or to allow the President and Benefit Representative to retain their seniority, as required by the labor agreements, and the legality of such provisions are not before us on appeal.

Titan have not vested. As such, they are not exempt under Section 302(c)(1). *See Phillips*, 19 F.3d at 1575 ("[T]he section [302(c)(1)] exception does not apply when a company pays a union official who was a former employee, but who did not have a right to such payment before he severed his employment relationship with the company.").

Admittedly, some fringe benefits are dependent on *what* the former employee does, such as payment for medical, military, or jury duty leave. But the right to those benefits have vested prior to the employee taking the leave, and the right to receive the benefit does not depend on the quantity or quality of future services. In other words, the "what" a former employee does on their leave of absence, such as for sick leave or jury duty leave, is merely a qualification for the benefit, it is not the reason for the benefit.[15] Moreover, such fringe benefits are generally applicable to all employees, whereas here only union members elected to office can receive such payments.[16]

---

[15] The Second Circuit in *BASF Wyandotte*, 791 F.2d at 1049, found "no meaningful distinction" between commonly available fringe benefits such as sick leave, military leave, or jury leave, and leave granted current employees pursuant to a "no-docking" provision in a collective bargaining agreement. But as discussed *infra* pp. 37–42, this case is not a "no-docking" case. And as *BASF Wyandotte* found, there is a distinction between a no-docking fringe benefit and paying a former employee his full union salary. *Id.* at 1049 n.1, 1050.

[16] This circuit in *Toth*, 883 F.2d 1297, discussed *infra* pp. 30–34, also stated that to qualify as a payment "by reason of" former employment, it is crucial that the term is included in a CBA and "*uniformly applicable* and nondiscriminatory." *Id.* at 1304 (emphasis added).

In fact, that only union members can qualify for the purported fringe benefit (that is, full-time paid leave to serve as a union officer), seemingly would render such a benefit illegal under the NLRA because it discriminates between union and non-union members. As the Supreme Court explained in *Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. NLRB*, 347 U.S. 17 (1954), where the union is the "exclusive bargaining agent for both member and nonmember employees, the employer could not, without violating § 8(a)(3), discriminate in wages solely on the basis of such membership even though it had executed a contract with the union prescribing such action." *Id.* at 47. The Court further explained that "[s]tatements throughout the legislative history of the National Labor Relations Act emphasize that exclusive bargaining agents are powerless to make agreements more favorable to the majority than to the minority." *Id.* at 47 (internal quotation omitted). Yet, such disparate treatment served as the basis for the Third Circuit's reasoning in *Caterpillar*: "Every employee implicitly gave up a small amount in current wages and benefits in exchange for a promise that, if he or she should someday be elected grievance chairperson, Caterpillar would continue to pay his or her salary."[17]

---

[17]   Judge Mansmann in her dissent expanded on this problem and we find her discussion particularly instructive: "In an open shop, not all employees governed by the collective bargaining agreement will necessarily be members of the union. An employee who is not a member of the union (and who therefore cannot aspire to become a grievance chairperson) will nonetheless be forced to endure a lower salary or reduced benefits due to his co-workers' decision to 'give up something.' In addition, unions will be

(continued...)

As discussed above, there is a difference in kind between fringe benefits and paying a union official's full-time salary. There is also a difference in degree. Paid leave for jury duty, military reserve duty, or sick leave, is short-term, while the President and Benefit Representative are seeking full-time leave pay for years of service to Local 745. Additionally, paying Local 745's President's full-time salary totals nearly $80,000 annually, with another approximately $50,000 a year going to the Benefit Representative. Fringe benefits may be expensive, but not to this degree. In fact, the President's union salary could well exceed the salary he would have earned while actually working for Titan because the bylaws base his salary on 60 hours of work per week at the highest base rate at the plant. At a certain point, the degree is so great that it would not be reasonable to say the payment is "by reason of" past service to the employer.

*Toth*, 883 F.2d 1297, made this point. In *Toth*, former USX workers sought pension benefits based on time they had been on leave of absence from USX to work for the union. *Id.* at 1298.

---

[17] (...continued)
able to circumvent the problems that arise when some employees elect not to join the union or pay union dues—they will seek agreements from the employer to subsidize representatives' salaries in exchange for reductions in pay or benefits. These agreements will be negotiated and ratified without the input of the non-union employees. Thus, an employee who elects not to pay union dues may nonetheless face reductions in salary or benefits so that the union (which he or she does not support) may prosper. The payments at issue here are surely not 'by reason of' the nonunion employees' services—yet those same payments are made possible by the non-union employees' reduced salary and benefits." 107 F.3d at 1062–63.

Prior to 1984, USX had allowed its employees to accrue pension-benefit rights while on leave of absences for up to two years. *Id.* at 1298. In 1984, USX changed its leave of absence policy to permit former employees to continue accruing pension credit until they retired, whether they worked for the company or had left to work for the union. *Id*. The change in the leave policy resulted from alleged collusion between USX and union leaders to benefit a select few higher-ups at the union. *Id.* at 1299–1300. However, shortly after the plaintiffs in *Toth* applied for benefits, USX rescinded the leave of absence policy, contending that the policy violated section 302 of the LMRA. *Id.* at 1299.

After quoting the relevant statutory language, this court in *Toth* focused on the meaning of "by reason of" an employee's past employment. We first rejected the Third Circuit's view in *Trailways*[18] that the "by reason of" clause only exempts payments made to former employees while they were employees of the company. *Id.* at 1303. We then explained that "[o]ne obvious instance in which continuing payments constitute recompense for past services is when those continuing payments were bargained for and formed part of a collective bargaining agreement." *Id.* at 1304. This is because "[e]mployees might accept lower wages now in return for future benefits; the work they subsequently perform is as surely performed in order to earn those future benefits as it is to earn current wages. In those cases future benefits would be 'in compensation for' or 'by reason of' past employment." *Id.* at 1304. We

---

[18] As noted earlier, the Third Circuit in *Caterpillar* overruled its prior decision in *Trailways*, 785 F.2d 101.

added that "collective bargaining and inclusion in a generally disseminated collective bargaining agreement, whose terms are uniformly applicable and nondiscriminatory, are crucial." *Id.* at 1304.

However, and significantly for purposes of this case, *Toth* explained that, "[a]t some point, it is conceivable that a bargain struck by the union and the employer might yet violate section 302—if, for example, the terms of compensation for former employment were clearly so incommensurate with that former employment as not to qualify as payments 'in compensation for or by reason of' that employment." *Id.* at 1305. In support of this proposition, *Toth* quoted from *BASF Wyandotte*, wherein the Second Circuit stated, "we do not suggest that [section 302(c)(1)] would allow an employer simply to put a union official on its payroll while assigning him no work. … [T]his would be precisely the kind of device that §§ 302(a) and (b) were designed to prevent." *Toth*, 883 F.2d at 1305 (quoting *BASF Wyandotte*, 791 F.2d at 1050). *Toth* then added that "full-time pay for no service cannot reasonably be said to be compensation 'by reason of' service as an employee." *Toth*, 883 F.2d at 1305. And *Toth* also explained that "given the overall purpose of section 302 (to prevent bribery), we may not construe the phrase 'as compensation for, or by reason of' too broadly." *Id.* at 1303–04.

After setting forth these general principles, *Toth* concluded that the USX "policy in the case before us cannot qualify as 'compensation for or by reason of' former employment because … the USX's leave policy was not a part of the bargained-for collective bargaining agreement. It was a unilateral change— under the plaintiffs' own allegations, a bribe." *Id.* at 1305.

The facts of this case clearly differ from *Toth*. There is no allegation that the payments were bribes. Rather, the arbitrator found, based on the labor agreements and past practices, that Titan was contractually obligated to pay the union President's and Benefit Representative's full-time salaries. And those labor agreements were approved by union members. Local 745 relies on these facts to claim that the payments are "by reason of" the President's and Benefit Representative's former service as Titan employees. In making this argument, Local 745 asserts that *Toth* stands for the proposition that "payments pass muster under Section 302(c)(1) where the obligations are established in a collective bargaining agreement."

This argument misreads *Toth*. As Titan correctly points out, *Toth* does not stand for the proposition that any payments authorized by a CBA are "by reason of" the former service of the employee. In fact, such a reading of Section 302(c)(1) would render the general prohibition contained in Section 302(a) a nullity. *Caterpillar*, 107 F.3d at 1061 (Mansmann, J., dissenting) (concluding that "the majority expands the exception such that the rule is rendered a nullity"). It would also allow parties to contract away the criminal prohibition Congress established in Section 302(a). Further, such an argument cannot be squared with the plain language of Section 302(a) because that section prohibits not merely the paying of money to a union representative, but the *agreeing to pay* such a representative, which of course is what a CBA is: an agreement to pay. 29 U.S.C. § 186(a) ("It shall be unlawful for any employer … to pay, lend, or deliver, or *agree to pay*, lend, or deliver, any money or other thing of value … to any representative of any of his employees who are employed in an industry affecting commerce."

(emphasis added)). Or as Judge Mansmann aptly put it: "If an agreement to pay is unlawful under section 302(a)(1), it is illogical to use the same agreement as a basis for finding that the resultant payment is lawful under section 302(c)(1)." *Catperillar*, 107 F.3d at 1061 (Mansmann, J., dissenting).

Moreover, while *Toth* stated that inclusion in a collective bargaining agreement was crucial to the legality of a payment to a union representative, 883 F.2d at 1305, this court also noted the need for there to be "a firm connection" between the bargained-for term and "the terms of prior employment." *Toth*, 883 F.2d at 1305. This means that, at some point, "a bargain struck by the union and the employer might yet violate section 302—if, for example, the terms of compensation for former employment were clearly so incommensurate with that former employment as not to qualify as payments 'in compensation for or by reason of' that employment." *Id.* at 1305.

That is what we have here. Paying Local 745's President and Benefit Representative their full-time union salaries has no firm connection to their prior service as Titan employees. Such payments are also different in kind from other fringe benefits. And they are different in degree because it is "so incommensurate with that former employment. " Accordingly, it is not "by reason of" that former employment.

C.  Statutory Purpose

Our conclusion above that Titan's agreement with the union to pay Local 745's President's and Benefit Representative's full-time salaries is illegal under Section 302 is also consistent with the statutory purpose of that Section. Initially, we note that where the statutory language is clear, we need not

consider the statutory purpose. *Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1128 (7th Cir. 2008). And we believe the statutory language in this case is clear. However, we address the statutory purpose here because the majority opinion in *Caterpillar* relied on the underlying purpose of Section 302 to uphold the payments at issue in that case.

Specifically, in Caterpillar, the majority noted: "[W]e simply do not view the payments at issue here as posing the kind of harm to the collective bargaining process that Congress contemplated when it enacted the LMRA. Section 302 of that statute was passed to address bribery, extortion and other corrupt practices conducted in secret." *Caterpillar*, 107 F.3d at 1057.

We acknowledged in *Toth* that "[i]t is fairly universally acknowledged that a central purpose of section 302 as a whole was to prevent employers from bribing union officials." *Toth*, 883 F.3d at 1300. But another central purpose of section 302 is to prevent conflicts of interest. *See Kaye*, 556 F.2d 855. In *Kaye*, we observed that Section 302

> condemns union employees and representatives who act to further self-interest or personal profit: For centuries the law has forbidden any person in a position of trust to hold interests or enter into transactions in which self-interest may conflict with complete loyalty to those whom they serve. … [N]o responsible trade union official should have a personal financial interest which conflicts with the full performance of his fiduciary

duties as a workers' representative. … Play-
ing both sides of the street, using union office
for personal financial advantage, undercover
deals, and other conflicts of interest corrupt,
and thereby undermine and weaken the labor
movement. … The Government which vests
in labor unions the power to act as exclusive
bargaining representative must make sure
that the power is used for the benefit of
workers and not for personal profit.

*Kaye*, 556 F.2d at 865 n.12 (quoting United States Code
Congressional and Administrative News, 86th Cong., 1st Sess.,
P.L. 86-257, pp. 2330–31); *see also Phillips*, 19 F.3d at 1574 ("The
Taft-Hartley Act, 29 U.S.C. §§ 141–187, is, in part, a conflict-of-
interest statute designed to eliminate practices that have the
potential for corrupting the labor movement. To achieve this
goal, Congress prohibited *all* payments from employers to
representatives of their employees and union officials [in
Section 302(a)]" (citation omitted)).

Thus, preventing bribery is not the sole purpose of Section
302. And prohibiting an employer from paying the full-time
salaries of the union's President and Benefit Representative
serves the statute's goal of preventing conflicts of interest. In
this case, the union's President was also head of the Grievance
and Negotiating Committee. Thus, he was negotiating the very
labor agreements that provided for his full-time salary, as well
as the full-time salary of another union official, both at the
highest factory rate for 60 and 48 hours respectively. While
their salaries were approved by the union membership in the
union bylaws, that membership has no way of knowing

whether Titan's agreement to pay the union salaries came at
the expense of lower salaries or benefits for plant workers.
That is not to say that the payments were bribes or backroom
deals—there is no evidence of that kind. But the President has
an incentive to preserve his own salary and to make his
generous salary appear cost-free to union members by having
it covered by Titan, rather than union dues. It is this conflicted
interest and diversion of employee wages to union leaders
which Section 302(a) seeks to address. *See Caterpillar*, 107 F.3d
at 1060 (Mansmann, J., dissenting) (such an arrangement
"create[s] a conflict of interest for union negotiators who may
agree to reduced benefits for the employees in exchange for
financial support for the union"); *see also*, 92 Cong. Rec. 5428
(1946) ("It prohibits taking money that has been earned by the
employees themselves and paying it to a union." (Statement of
Senator Taft)).

D.  No-Docking Provisions

Before closing, we pause to stress that our holding in no
way calls into question the validity of no-docking clauses.
"Under a no-docking clause, the employer agrees that shop
stewards may leave their assigned work areas for portions of
a day to process employee grievances without loss of pay."
*Caterpillar*, 107 F.3d at 1056. As the Second Circuit recognized,

> no-docking arrangements have been consis-
> tently upheld by the courts as not in violation
> of § 302, *see NLRB v. BASF Wyandotte Corp.,*
> 798 F.2d 849, 854–56 (5th Cir. 1986); *BASF*
> *Wyandotte Corp. v. Local 227,* 791 F.2d 1046 (2d
> Cir. 1986); *Herrera v. Int'l Union, UAW, 73*

F.3d 1056 (10th Cir. 1996), *aff'g & adopting dist. ct. analysis*, 858 F. Supp. 1529, 1546 (D.Kan. 1994); *Communications Workers v. Bell Atlantic Network Servs., Inc.*, 670 F.Supp. 416, 423–24 (D.D.C. 1987); *Employees' Independent Union v. Wyman Gordon Co.*, 314 F.Supp. 458, 461 (N.D.Ill. 1970).

*Id*.

The Third Circuit in *Caterpillar* believed the legality of no-docking clauses meant that a CBA provision providing for full-time pay for union committeemen and grievance chairmen was likewise exempt under 302(c)(1). The court thought "any attempt to distinguish 'no docking' provisions from the payments at issue here is unpersuasive." 107 F.3d at 1057. And it "perceive[d] no distinction between union officials who spend part of their time (which may be quite substantial) in adjusting grievances from the type of employees who are involved here." *Id*. The court also noted "it would be strange indeed if Congress intended that granting four employees two hours per day of paid union leave is permissible, while granting a single employee eight hours per day of that same leave is a federal crime." *Id*. at 1056.

Again, we disagree with *Caterpillar*. Here we find the reasoning of the Ninth Circuit in *BF Goodrich*, which also rejected this line of reasoning, more persuasive. In *BF Goodrich*, the court held that BF Goodrich could legally pay the union's full-time "Chief Shop Steward" because he was subject to BF Goodrich's control and thereby an employee. But in reaching this conclusion, the Ninth Circuit rejected the union's argu-

ment that paying the salary and benefits of a full-time union representative is permissible under a contractual "no-docking" provision, because such payments are authorized by Section 8(a)(2) of the National Labor Relations Act ("NLRA"). 29 U.S.C. § 158(a)(2); *BF Goodrich*, 387 F.3d at 1052. Specifically, Section 8(a)(2) provides "[t]hat subject to rules and regulations made and published by the [NLRB], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay." (Emphasis added.) 29 U.S.C. § 158(a)(2). As the Ninth Circuit explained, that language has been unchanged for nearly 70 years and there are similar provisions in the Railway Labor Act and the Federal Service Labor-Management Relations Statute. *BF Goodrich*, 387 F.3d at 1052–53.

In addressing this argument, the Ninth Circuit in *BF Goodrich* first noted that harmonizing the seemingly contradictory provisions found in Sections 8(a)(2) and 302(a) "may seem a daunting task." *Id.* at 1053. But the court then concluded there was no need to do so because "[t]he provisions of the agreement requiring Goodrich to compensate a full-time union representative differ from typical no-docking provisions—at least as [the] NLRA contemplates them." *Id.* The court explained that the "without loss of time" language of Section 8(a)(2) was a "key linguistic signal" and that "if an employee's only responsibility is to represent union employees in the grievance process, no 'working hours' could be 'los[t] by his doing just that." *Id.* Thus, [t]he company would have no reason to 'dock' the employee's pay; he would simply be doing what his contract provides." *Id.* The Ninth Circuit also explicitly rejected the Third Circuit's reasoning in *Caterpillar* that there is

no difference between a part-time no-docking provision and a full-time one, stating: "[I]t is not inconceivable that Congress might treat these different arrangements differently. Quite simply, the potential for corporate payments to undermine the independence of a union representative may be considerably greater when the employee's entire salary and benefits are attributable to his conduct as a representative." *Id.* at 1056 n.13.[19]

We agree with the Ninth Circuit that Section 8(a)(2) does not apply to full-time union employees and that "this case differ[s] from the no-docking provisions contemplated by the NLRA." *Id*. at 1054. In this case there is "no loss of time" because Local 745's President and Benefit Representative are not working for Titan *at all*. *See also BASF Wyandotte,* 791 F.2d at 1049 n.1 ("[N]o-docking provisions have relevance only to persons who are currently serving as employees."). Moreover, as the Ninth Circuit recognized, Congress could have reasonably decided to treat part-time no-docking provisions differently than full-time pay to union employees, namely the desire

---

[19] *See also Caterpillar*, 107 F.3d at 1064 (Mansmann, J., dissenting) (distinguishing payments to full-time union "grievance chairmen" and no-docking provisions, in part, because "employees subject to no-docking payments are more likely to do union work on an 'as needed' basis. They are also more likely to be able to schedule grievance meetings and other union work at the mutual convenience of the employees and the employer. In contrast, the grievance chairmen in this case are paid full time regardless of whether there is any union work to be done. They are never available to perform services for the employer."); *id.* at 1073 (Alito, J., dissenting) ("'No docking' provisions differ, at least in degree, from the type of arrangement that is before us, and there are times in the law when differences in degree are dispositive.").

to prevent "corporate payments [from] undermin[ing] the independence of a union representative." *BF Goodrich*, 387 F.3d at 1056 n.13. Whatever Congress's intent, though, we must consider the statutory language and must read the statutory language, if possible, to give effect to both Section 8(a)(2) and Section 302. Section 8(a)(2) permits no-docking provisions for employees and thus we read Section 302 as allowing the same. Nothing in the statutory language, however, permits full-time pay for former employees—even if they are doing all of the same things an employee might do part-time pursuant to a no-docking provision. Had Congress intended to authorize such payments, it could have so provided. It is for Congress and not the courts to create exceptions within the LMRA's plain language. *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 490 (1947); *Caterpillar*, 107 F.3d at 1058 (Mansmann, J., dissenting).

Furthermore, the facts of this case distinguish the situation before us even more from typical "no-docking" provisions because Local 745's President and Benefit Representative are not "'confer[ring] with [the employer]' or otherwise representing union interests in connection with the grievance process," on a full-time basis. *BF Goodrich*, 387 F.3d at 1053 (quoting 29 U.S.C. § 158(a)(2)). Rather, the President and Benefit Representative are doing many other things, including assisting retirees with health and life insurance benefits and aiding individuals laid off in obtaining unemployment and other benefits, as well as representing four classes of workers in the Freeport School District. The President and the Benefit Representative in this case are just not equivalent to the full-time committeemen or grievance chairmen whose pay was at issue *Caterpillar*. In

short, as in *BF Goodrich*, "[t]he legality of no-docking provisions is not before us." *Id*.

### III.

The arbitrator found that the labor agreements between Titan and the union required Titan to pay the full-time salaries of Local 745's President and Benefit Representative. However, such an agreement violates the plain language of Section 302(a) of the LMRA and is not exempt by Section 302(c) because the President's and Benefit Representative's full-time salaries are not vested rights earned "by reason of" their former employment at Titan. Rather, the President and Benefit Representative earn their current salaries because of their service to Local 745 members. Because the arbitrator's order to Titan to reinstate direct salary payments to the President and Benefit Representative would require Titan to violate Section 302, its decision must be vacated. For these and the forgoing reasons, we REVERSE and REMAND for further proceedings consistent with this opinion.

WOOD, *Chief Judge*, with whom WILLIAMS and HAMILTON, *Circuit Judges*, join, dissenting from the denial of rehearing *en banc*. The majority has chosen to create a conflict with the Third Circuit in this case over the proper interpretation of section 302 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186. The question, briefly, involves when an employer is entitled to pay money or any other thing of value to a union representative who is a present or former employee. See section 302(c)(1), 29 U.S.C. § 186(c)(1). The importance of the question is attested by the Supreme Court's grant of *certiorari* in *Caterpillar, Inc. v. Int'l Union, United Auto. Aerospace & Agric. Implements Workers of Am., et al.*, 521 U.S. 1152 (1997). Although that case was settled before the Court issued an opinion, that happenstance says nothing about the significance of the issue. Moreover, for the reasons I sketch out here, I believe that the majority has adopted a position that is inconsistent with the LMRA and that disregards the proper standard of review for arbitral awards. I would set this case for argument before the *en banc* court, because I believe that there are powerful reasons to affirm the district court.

I begin with the fact that this court is being asked to overturn an arbitral award. Despite the fact that arbitral awards must be upheld even if a court disagrees with the outcome, *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013), and even if a court thinks that a mistake of law has been made, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010), the panel here has engaged in *de novo* review of the arbitrator's conclusion that Titan made payments to the president and benefit representative of the Union "by reason of their former employment" with Titan. That finding of the arbitrator is a classic application of the law to facts. The question before this court is therefore not whether we

would have made the same finding; it is whether the parties agreed to commit that issue to arbitration, and whether the arbitrator's decision is tied to the collective bargaining agreement.

The panel has tried to shoehorn its decision into the narrow space created by the doctrine that arbitrators are not authorized to order parties to take an illegal act, recognized in *EEOC v. Ind. Bell Tel. Co.*, 256 F.3d 516, 524 (7th Cir. 2001) (*en banc*), and based on the Supreme Court's cases explaining that a reviewing court should not enforce an arbitration award that is contrary to "well defined and dominant" public policy. *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*, 461 U.S. 757, 766 (1983). But I am not persuaded that this case can be forced into that exception. I am especially struck by the breadth of the panel's phrasing of the question presented, as it appears on page 3 of the opinion: "This appeal presents an issue of first impression in this circuit, namely whether a company may legally pay the full-time salaries of the President and Benefit Representative of the union representing the company's employees." Op. at 3. The Third Circuit's decision in *Caterpillar, Inc. v. Int'l Union, United Auto. Aerospace & Agric. Implements Workers of Am.*, 107 F.3d 1052 (3d Cir. 1997), held that the answer to this question is yes. The panel, with the acquiescence of a majority of the active judges, has decided to follow the views of one of the dissenting judges in that case. This is a mistake, in my view.

In order to explain why that step is unwarranted and why the Third Circuit's majority had the better of the argument, I begin with the language of section 302 of the LMRA,

29 U.S.C. § 186. Section 302(a) opens with a broad prohibition:

> It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
>
> (1) to any representative of any of his employees who are employed in an industry affecting commerce; …

Subsection (c) of the statute then sets out a long list of exceptions to that general prohibition. The exception that is applicable here is found in section 302(c)(1) (emphasis added):

> The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or *former* employee of such employer, as compensation for, or *by reason of*, his service as an employee of such employer; …

The arbitrator in the present case found as a fact that Union President Steve Vanderheyden and Union Benefit

Representative Kevin Kirk were former full-time employees of Titan, that they were receiving money from Titan in the amount of their full salaries (as specified in the CBA), and that they were receiving those salaries by reason of their service as former employees of Titan. They were also receiving an array of fringe benefits, including health care and pension contributions. Oddly, the majority either does not seem to think that those fringe benefits were a "thing of value," or perhaps it thinks that former employees who do not become union representatives nonetheless retain sick leave and comparable fringe benefits (though I do not know why this would be so). Alternatively, the majority tries to characterize benefits as something different "in degree" from salary, but nothing in the statutory language shaves things so finely. One way or the other, the majority appears willing to allow the employer to cover those costs. See, *e.g.,* op. at 26–27. It seems to me that if these benefits are permissible under sections 302(a) and (c), then salary is too. It would come as news to most people that fringe benefits like health care are not a "thing of value."

I recognize the concern that there is an embedded conflict of interest when an employer pays the salary of a union representative—or indeed, as section 302(a) says, when an employer gives a union member any "thing of value." But Congress was well aware of this conflict and resolved it expressly through the combination of the general prohibition of section 302(a) and the exceptions of 302(c). It is not up to us to decide whether Congress struck the right balance; we have only to apply the law as it is written.

Because it is undisputed that Vanderheyden and Kirk are both former employees of Titan, the question boils down to

this: was Titan paying their salaries "by reason of" their service as former employees? The majority first endorses the position taken in Judge Mansmann's dissent in the Third Circuit's decision in *Caterpillar*, in which she argued that the "by reason of" exception simply does not apply to salaries. Instead, she suggested, that exception does no more than "recognize[] that current and former employees might have a right to receive payments from their employers that arise from their services for their employers but that are not properly classified as 'compensation.'" Op. at 22. The only, but fatal, problem with that position is that neither section 302(a) nor section 302(c)(1) contains any such limitation. To the contrary, both sections use the broadest possible language; they speak identically of "*any* money or *other thing* of value." If Congress had wanted to draw the line Judge Mansmann proposed, it easily could have done so. But it did not.

Judge Mansmann's conclusion that the employer's decision in *Caterpillar* to cover the union representatives' salaries must have been *unrelated* to (that is, not "by reason of") their former work for the employer is doubly flawed. Not only does that position rest on a limitation that the statute does not recognize; it also fails to recognize that the coverage of the salaries of certain union members can be explained only by the former relationship with the employer. When a collective bargaining agreement is in place, that agreement helps to keep labor peace, through mechanisms such as a smoothly functioning seniority system, well understood responsibilities in each job, and, most importantly, a grievance procedure. Union representatives play a critical role in the smooth functioning of the workplace. Although it is possible that having a union

representative who knows nothing about the particular employer, the particular workplace, and applicable industry norms might work, it is normally preferable to have a union representative with a thorough understanding of the employer's business—in other words, to use a former (and potentially future) employee. That is undoubtedly why Congress chose to include this exception in section 302(c)(1). Not a word in the statute indicates that this exception is available only to part-time union representatives.

Then-Judge Alito's dissent similarly inserts language into the statute that is not there. He divined that the phrase "by reason of" must imply that the identified characteristic (here, former employee status) can only be a *major* cause, not just a motivating factor. As support, he notes that the Green Bay Packers could not have won Super Bowl XXXI without defeating the San Francisco 49ers in the first round of the playoffs, but that it would be odd to say that the Packers won the Super Bowl "by reason of" defeating the 49ers. 107 F.3d at 1069. At one level, however, his example simply illustrates one of thousands of possible instances of the *post hoc, ergo propter hoc* fallacy; at another level, what is really worrying him is not the causal chain, which certainly exists, but remoteness: one necessary (but not sufficient) step along the way to the Packers' Super Bowl victory was to eliminate the 49ers. Neither the logical fallacy nor the causation problem exists here. The arbitrator found that Titan was paying Vanderheyden and Kirk precisely because they were the two former employees with responsibility to make the collective bargaining agreement work. There is a clear line of logic, motivation, and causation. At a minimum, the point is not so unclear that the arbitrator's factual finding should be overturned.

I would set this case for *en banc* consideration for two reasons. First, and most importantly, I believe that the majority has taken an action that is inconsistent with a long line of Supreme Court decisions instructing courts to accept the results of consensual arbitration, even if we think those results are mistaken or ill-advised. See *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010); *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000); *United Paperworks Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."). Second, looking particularly to labor law, I see nothing in this arbitral result that is either inconsistent with section 302 of the LMRA or that commands the parties to take an illegal action. To the contrary, the majority has upset the balance that Congress wrote into the statute, by engrafting its own limitations onto the existing structure. The case is thus important both for what it does to arbitration, and for what it does to labor law. I respectfully dissent.